STATE, RESPONDENT, *v.* GEDDES, APPELLANT.

[No. 1308.]

[Submitted Jan. 5, 1899. Decided Jan. 23, 1899.]

*Homicide—Evidence—Testimony of Accomplice—Corroboration—Indictment—Issues and Proof—Instructions—Witness, Accomplice as—Complaint in Another Case as Evidence.*

TESTIMONY OF ACCOMPLICE—*Corroboration.*—Testimony of the accomplice, who committed the murder during the absence of defendant in the State of Illinois—(where defendant had been for nearly three weeks prior to the killing, during which time he in no way communicated with the accomplice, or did any act or made any declaration in furtherance of any concerted plan to do the deceased violence)—that defendant had, in conversations with him prior to defendant's departure, said: that deceased had had him indicted. and he wanted deceased killed, and desired the accomplice to get the deceased "out" so that he (defendant), or others, could kill the deceased, is not sufficiently corroborated to sustain a conviction—assuming that this testimony implicates defendant at all,—by evidence that defendant had been informed against by the County Attorney for an assault upon deceased, and was sued in damages by deceased for the assault. and that defendant had told several persons that he had committed the assault, and was sorry that he did not kill deceased; that when he presented his side of the case it would appear in a different light; that he would get even with deceased, and if he did not stop talking about defendant, something would happen.

INDICTMENT—*Issues and Proof.*—Under Penal Code, Sec. 1852, providing that persons aiding and abetting a crime, although not present, must be prosecuted as principals, "and no other facts need be alleged in any indictment or information against such an accessory, than are required in an indictment or information against his principal," an indictment for murder, charging defendant as principal, is sustained by proof that he was guilty of advising and encouraging the crime.

SAME—*Constitution.*—Penal Code, Sec. 1852, providing that no other facts need be alleged in an indictment against an accessory than are required in an indictment against a principal does not violate Constitution, Art. III, Sec. 16, guaranteeing to an accused the right to demand the nature and cause of the accusation.

INSTRUCTIONS—An instruction should follow the language of the statute. and state that accessories are those who "advise and encourage," instead of "advise or encourage," the commission of crime.

WITNESS—*Accomplice as.*—Under Penal Code, Sec. 2443, permitting an accomplice to be a witness for or against an accused, an accomplice is a competent witness against an accused, although his testimony was obtained by threats or inducements.

Such facts only bear upon his credibility, and not upon his competency; and his testimony is not subject to the rules governing admissions by a prisoner accused and on trial.

SAME—*Same—Cross-Examination of.*—Very great latitude should be allowed in the cross-examination of an an accomplice.

EVIDENCE— *Complaint in Another Case as.*—In a prosecution for murder, a complaint filed against accused by deceased is admissable in evidence to show motive.

Where a complaint filed by deceased against accused is admitted in evidence, the court should charge that the evidence could be considered only as bearing on the question of motive.

*Appeal from District Court, Custer County; C. H. Loud, Judge.*

GEORGE S. GEDDES was convicted of murder in the second degree, and appeals.    Reversed.

The statement of facts appears in the opinion.

*O. F. Goddard, C. R. Middleton* and *Wm. H. De Witt,* for Appellant.

The question is presented to this court, whether an information charging one simply as principal is sustained by testimony showing, without contradiction, that he was, if anything, only an accessory and was in fact not a principal.    This question has not been passed upon by the Supreme Court of this State.    The court approached its consideration in *State* v. *Gleim*, 17 Mont. 17.    We now ask the court to take one step further than the Gleim case, and to hold that such an information as was considered in the Gleim case is not only proper but necessary.    We are fully aware of the force of Section 1852, Penal Code, which provides that accessories shall be tried as principals, and that no further facts need be alleged in any indictment or information against an accessory, than are required against a principal, but we contend that this statute is in direct contravention of Section 1832, Penal Code, and also of the Constitution, Art. III, Sec. 16.    (*People* v. *Trim*, 39 Cal. 75; *People* v. *Campbell*, 40 Cal. 141; see, also, *Shannon* v. *The People*, 5 Mich. 71; *Smith* v. *State*, 32 Ark. 274; *Williams* v. *State*, 41 Ark. 173.)    It is not competent for the Legislature to authorize any information which does not substantially inform the defendant of the nature and cause of the

accusation against him. (Constitution, Art. III, Sec. 16; *Brown* v. *People*, 29 Mich. 233; *Chapman* v. *The People*, 39 Mich. 357; *Mervin* v. *The People*, 26 Mich. 298; *Hall* v. *The People*, 43 Mich. 417; *Sneed* v. *The People*, 38 Mich. 248; *Brunes* v. *The People*, 37 Mich. 515; *Durand* v. *The People*, 47 Mich. 332; *The People* v. *Marion*, 28 Mich. 255; *The People* v. *Goldberg*, 39 Mich. 545; see, also, *State* v. *Flaherty*, 7 Nev. 153; *The People* v. *Schwartz*, 32 Cal. 160; *The People* v. *Bunmar*, 106 N. Y. 502, 510; a thoroughly well considered and reasoned case is *State* v. *Gifford*, from the State of Washington, 53 Pac. Rep. 709.)

In the instruction the court departed from the statute. The Statute, Section 41, states: "have advised and encouraged its commission." The instruction states: "it is sufficient if they (that is to say, the defendant or defendants) are cognizant of the purpose to commit the offense or aid or abet or encourage, etc." This instruction was duly excepted to. Appellant contends that the word "and" occurring in the statute between the words "advised" and "encouraged," cannot by the court be converted into the word "or." The statute provides that, in order to constitute one an accessory, that he shall have advised and encouraged the crime. It is quite true that the word "and" may sometimes be read "or," but it is held in the case of the *United States* v. *Ten Cases of Shawls*, 28 Fed. Cases, No. 16448, that in a penal statute "and" can never be read as "or." Commenting upon the convertibility of the words "and" and "or," Bishop, in New Criminal Law, Vol. 1, Sec. 941, says: "Where the words of the statute are fine *and* imprisonment, both must be inflicted; otherwise where the conjunction is *or*, then only one of them can be imposed." In the case of *Lebcher* v. *The Commissioners of Custer County*, 9 Mont. 315, this Court in the civil case held that the word "and" must be read "and."

First: The whole testimony of Dixon was incompetent, because he confessed in the course of his own cross-examination that it was given under threats and inducements. Second: The court erred in not allowing the defendant's counsel to

first ascertain whether or not Dixon's testimony was given under threats or inducements. (3 Rice on Evidence, pp. 495, 591; *People* v. *Fox*, 121 N. Y. 453; *People* v. *Barric*, 49 Cal. 345; 1 Greenleaf on Evidence, Chap. 12; *Territory* v. *McClin*, 1 Mont. 394; *Territory* v. *Underwood*, 8 Mont. 133.) The reading of the information and the civil complaint to the jury was error. (*State* v. *Donyes*, 14 Mont. 75; Rice on Evidence, Chap. 25, Vol. III; *State* v. *Corbin*, 56 N. Y. 363; *State* v. *Raymond*, 53 N. J. Law, 260; *State* v. *Gay*, 18 Mont. 51; see, *Binns* v. *State*, 53 Ind. 46, 26 Am. Rep. 48; also same case on former appeal, 46 Ind. 311; *Pinkford* v. *State*, 13 Tex. App. 468-478.)

*C. B. Nolan, Attorney General,* and *T. J. Porter,* for the State.

Without a certificate expressly declaring that the record contains all of the evidence, the evidence cannot be considered as insufficient to sustain the verdict. (Am. and Eng. Ency. of Pleading and Practice, Vol. 3, page 423; *Ohio & Mis. Valley Co.* v. *Rufus Cope,* 36 Ills. App. 97; *Grimley* v. *Donahue,* 36 Ills. App. 551; *City of Mt. Vernon* v. *Lee,* 36 Ills. App. 24; *Fellenzer et al.* v. *Van Valzah,* 95 Ind. 128; *Fortner* v. *Meyers,* 6 Neb. 414; *Townley* v. *Chicago R. R. Co.,* 53 Wis. 626; *Howard* v. *Bowman,* 23 Pac. 68.) There was sufficient corroboration of the testimony of the accomplice. (*U. S.* v. *Babcock,* 3 Dillon, 585; *Marler* v. *State,* 67 Ala. 55; *Com.* v. *Snow,* 111 Mass. 416; *Malachy* v. *State,* 89 Ala. 140; *Com.* v. *Holmes,* 127 Mass. 441; *Com.* v. *Savory,* 10 Cush. 535; *Rex* v. *Wilkes,* 7 Car. & P. 272; *Regina* v. *Birkett,* 8 Car. & P. 732; *Regina* v. *Mullins,* 3 Cox C. C. 531; *People* v. *Melvane,* 39 Cal. 616; *People* v. *Clough,* 73 Cal. 351; *People* v. *Barker,* 114 Cal. 619; *People* v. *McLean,* 84 Cal. 480; *People* v. *Kunz,* 73 Cal. 313; *People* v. *Cloonan,* 50 Cal. 449.)

**HUNT, J.**—The defendant appeals from an order denying his motion for a new trial, and from a judgment of conviction of the crime of murder in the second degree.

The defendant, George S. Geddes, and Thomas Welch and Richard Dixon were jointly informed against for the crime of murder.   The information charged that on November 4, 1897, at Custer county, this defendant and the other persons above named shot and killed Clemence W. Brown, who is spoken of throughout the record, and whom we shall designate as Winnie Brown.   The information is in the usual form of a charge of murder in the first degree.   Geddes, this defendant, was given a separate trial.   It appeared that on the afternoon of November 4, 1897, Winnie Brown and a brother of his, named Clarence, were returning with a four-horse team to their home, at a ranch on Lay creek, some 50 miles from Miles City.   On their way they passed the ranch of defendant, Geddes, on Tongue River road, in Custer county, and went to the mouth of Lay creek, about two miles beyond Geddes' ranch.   There the two brothers met a third brother, Hersey Brown, who was on horseback, and who joined Winnie and Clarence.   All three brothers continued their journey homeward and, when about a mile and a half from their ranch, Dixon, a co-defendant, rode up behind them with a gun in his hand, deliberately pointed the gun at Winnie and shot him through the body.   Winnie fell out of the wagon and Dixon rode off towards the hills.   The brothers of Winnie carried him to a washout and thereafter took him to what is called "Jackson's House," where he died the following morning as the result of his wounds.   Dixon is a colored man and confessedly the person who killed Winnie Brown.   He was the principal witness for the State and, so far as it is necessary to state his testimony upon the final issue involved in this trial, it was as follows:

"My name is Richard Dixon.   Am 22 years old and have lived in Custer county since 1884.   About August 19th I went to George Geddes' ranch, on Tongue river.   Had worked for Geddes before.   Mrs. Geddes wrote me a letter to come up.   When I got to the ranch I found George Geddes, Mrs. Geddes and Phil. White there.   I was at Geddes' ranch about a week.   I told Geddes I had come to town to

fetch a horse back. Stayed in town two days. When I got back to Geddes' ranch, I found Mr. Geddes, Mrs. Geddes, Tom Welch ·and Phil. ·White there. When I was in Miles City on that trip I saw Winnie Brown. When I got back Tom Welch asked me if 1 saw that Brown boy in town, and I told him I did. I had no talk with Geddes after I got back to the ranch. Three or four days after I got back I went with a team and a light spring buggy to Rosebud. A conversation occurred then with Mr. Geddes. Mr. Geddes said: 'It is a good thing my arm is hurt.. I was just getting so that I could ride or 1 would have killed him (Winnie Brown) long ago. I intended to kill him and roll him up in a canvas and throw him into a burning coal bank.' This conversation occurred on the drive, before we reached Rosebud. Geddes went from Rosebud to Miles City. I next saw him at the ranch—think about a week afterwards. I did not have any conversation with him relating to Winnie Brown when he came back to the ranch. Did at a later date at the ranch. Geddes said he saw the Brown boy in town and he guessed he was sick; he saw the doctor write him out a prescription for medicine. I then asked Geddes how his (Geddes') arm was getting along and he told me that the doctors had been at work at it some. After he came back there to the ranch I did not hear Geddes mention Winnie Brown's name at the ranch, nor until he went to Rosebud again. When he came up from town the first time, he came up on the Tongue River stage and stayed about a week or ten days at the ranch and then I took him to Rosebud again. He came down to see about his arm and there he told me that if Tom Welch would ever catch that boy out he would kill him. He told me that when we were passing Goodwin's place. He said that if Tom Welch would catch that boy out in the hills he would kill him and make way with him and they wouldn't find him. He did not make any further statement about the Brown boy at that time for a little while. When we got to Rosebud, Geddes slept in Beach's saloon. I saw Geddes about ten days after that in Miles City, in Smithy's saloon; I said, 'I thought you

had left for Chicago.' 'No,' he said, 'haven't left.' We
drank together. He said, 'I want to see you in the wine
room in a minute;' and we went back into the wine room and he
said, 'that Brown boy is in town and he has had three or four
indictments served on me;' and he wanted to know if I could
get anybody I could trust; and I asked him what for; and he
said, so as they could get him out so they could kill him; and
I says, 'I can't,' and he says, 'if you can't, I will myself;'
and I left him and went down to the store and got my things.
Geddes said this about ten or fifteen minutes before train time.
He had his pass and everything to go east. He wanted to
know if I could get anybody that I could trust and if I could
trust Fred. Rogers; and I asked him what for, and he told me,
and I told him. He said he wanted that Brown boy killed.
That is what he said to me. I told him that I could not do
it and he says, 'you get him out and I'll do it.' I saw Ged-
des at the train that evening. He was going to Rosebud to
see his wife. Saw Geddes the next day. When I left for
Rosebud, Geddes and his wife were in Miles City. Mrs. Ged-
des stayed in town that night and the next day. I went to
the ranch. Left Rosebud on Friday. Remained at the ranch
Saturday and left the ranch again for Rosebud on Saturday
morning. I think it was two days after I had the conversa-
tion with Geddes in Smithy's saloon. In September or Octo-
ber I heard a conversation in the front room of Geddes'
house. Mr. Geddes says, 'if I can get that Brown boy in
the hills, I will put his foot in the stirrup and let the horse
drag him to death.' He said that to Tom Welch and his
wife. He said he would do it himself. After I got back
from Miles City, when I took the horse down there, I had a
conversation with Tom Welch. Welch told me that the horse
he had he rode down there to rope that ———— on. He says,
'I intended to get him to running, and rope him and take my
dallies and turn the other way and jerk him off his horse and
drag him to death; and he will never know what hurt him.'
This conversation occurred immediately after I got back from
taking the horse back to Miles City, as testified to. Welch then

asked me if I saw the Brown boy in town, and what he was
doing. I told him he was breaking horses. He wanted to
know when he was coming up the river and I told him I
didn't know; he told me he was afraid of Tom Welch and
George Geddes and he was not coming up. About that time
Mrs. Geddes asked me if I thought he was coming up, so I
told her I didn't know. So I stayed down at the ranch two
days, and then she wanted me to come up and see if he had
come up the river, on Lay creek; see if he was there at the
ranch. Mrs. Geddes afterwards said that she did not want
the Brown boy to get back to town again; she wanted to catch
him before he got back; did not want him to get on the wit-
ness stand and swear against George Geddes, for the boy had
sued him for $1,500; and Mrs. Geddes wanted him kept away
so he would not get the money, and keep him from going to
town. Mrs. Geddes mentioned the subject again about two
days afterwards. She says, 'Dick, there is fifty dollars or
more for you or anybody else that will get away with that
Brown boy;' and I told her I could not do it. I don't think
Mrs. Geddes ever again mentioned the subject to me.

"Thursday, when I killed the boy, about 2 o'clock, Mrs.
Geddes was ironing in the kitchen; and she went into the front
room and took the field glasses and looked out and she says,
'Dick, there comes the Brown boys;' and she came back into
the kitchen and wanted to know if I was not going to do that
for George Geddes, and I told her, 'no;' and she says, 'go on
and kill him,' so he would not go on the witness stand and
swear against George Geddes; and I went and got the gun,
and got on my horse and went up the river, inside the fence
and the irrigating ditch and went to the mouth of Lay creek and
stayed there in a canyon and waited for the boys to come
past. I shot and ran around a big butte. When I got to the
ranch I says, 'Mrs. Geddes, I done it;' and she says, 'I am not
a damn bit sorry. He put us to a lot of trouble.' I said, 'I
have done something I am sorry for, Mrs. Geddes;' and she
said, 'I am not.' Mrs. Geddes spoke to me about their com-
ing along about half past eleven or twelve o'clock, when they

went up the river.   She asked me if I was not going to kill
that Brown boy, for to keep him from swearing against Mr.
Geddes; and I told her I wouldn't, and she wanted to know
why, and I told her I could not kill him just for that.   I got
the gun, a Winchester.   When I went to get it, Mrs. Geddes
was right in the dining room, and watching me.   I took six
cartridges with me.   They were right on the shelf above the
gun.   I went to the stable and got the horse.   When I was
getting the horse, Mrs. Geddes was at the kitchen, standing
at the kitchen door.   She could see me.   I got on the horse,
and crossed the river.   When she spoke to me at the house,
and took the glasses and looked at the Brown boys, they were
right in front of the house, in the main wagon road, about a
quarter of a mile from the house.   They were in a wagon,
driving four horses.   After shooting the first shot, I ran up
on a hill, and got off my horse and laid down there.   They
took a shot at me, and I fired two back.   I got back to the
ranch between half past four and five o'clock.   I fetched the
gun up to the house.   I wore a black silk handkerchief over
my face.   I cut two holes in it, so I could see, with a pen-
knife.   When I got back to the ranch, and showed Mrs. Ged-
des the handkerchief, she took it and burnt it up in the kitchen
stove—in the range.   That was just after I got back from
killing the boy.   When I got back in the house first, I cleaned
the gun and set it in the closet; and Mrs. Geddes went and
got the gun, and put it in the case, and put it up between the
ceiling and the stair landing.   I took it out afterwards, and
set it in the closet again, and she went and got the gun and
put it in her bedroom.   I used three shells out of the gun on
that trip.   The shells were taken out of the cartridge belt and
out of the gun; and all of the cartridges we could find around
the house, we took them and put them into a tomato can, and
I took and buried them in a manure pile right in front of the
barn door.   About the day of the killing, Mrs. Geddes asked
me what I had done with the shells, and I told her I left them
up there.   These cartridges for the gun were gathered up the
next day by I and Mrs. Geddes.   After getting back that day

from the shooting, I left the house to go over to the postoffice after the mail. Mrs. Geddes and I stayed at the ranch that night, leaving there the next morning to go to a ranch nine miles down the river. After I went to the Geddes ranch in August, Geddes and I had a conversation concerning the whipping of Winnie Brown. He asked me if I saw the Brown boy. I told him I did, and Geddes said he whipped him for tearing down his fence and talking about his wife. He said he went down to Terrett's, and fetched him up to the ranch; wanted him to help him put the fence up. The boy stayed there that night; and the next morning the boy was sitting in the kitchen, peeling some potatoes, and Geddes came in and put a gun at his head. He made him walk down to the stable and lay down on his stomach, and he tied a rope to him, and tied him up to the reach log of the barn, and he was swinging there, I suppose; and he took the whip and whipped him awhile, and then he sat down on the sill of the barn, and rolled a cigarette, and took a little rest, and said, 'As soon as I smoke, I will whip you some more.' Then he whipped him again, and then let him down, and then, taking him up to the house, ordered him off the place. When I had this conversation I was sitting outside, right in front of the kitchen door. This conversation was the second or third day after I got to Geddes' ranch. I have stated everything that Geddes said to me while sitting there. Mrs. Geddes told me she wrote a letter to Mr. Welch, and in it she told him of a note that the Brown boy had placed into the hands of a lawyer. She read the letter to me. She told him in the letter that she could not write to him what she wanted to tell him. She told me before the killing that she had written to Welch, that the note that he had written to the Brown boy, and the five dollars that he left for him to come up there on the O. W. range and get the cow was to pay his expenses up, and to go to Geddes and get a horse. That is the note the Brown boy had placed into the hands of the lawyers. Before the killing I took a letter out there to the mail for Mr. Welch. The letter contained, as Mrs. Geddes told me, she wrote to Tom Welch for fifty dol-

lars. That wasn't any more than three or four days before the killing. I gave the letter to the mail carrier. This is the gun that I had at the time of the shooting, and that is the case in which I placed the gun after cleaning it."

On cross-examination, witness testified as follows:

"After I was put in jail I talked with Mrs. McGurk and Harry Wright about this case. They asked me if I did it, and I told them, 'No.' Did not tell who did do it. I told them I did not know anything about it. I did not tell them in that conversation that Tom Welch killed Winnie Brown. Nothing of that kind. A day or two after I was put in jail I had a conversation in the presence of Mr. Porter, the County Attorney, and Johnnie Stafford. I told them, in substance, that, on the evening of the day of the killing, Tom Welch came to the Geddes ranch; that I saw him there. But I did not tell them that Mrs. Geddes told me that Welch had shot Winnie Brown. I did tell them, though, in that conversation, that Welch himself had told me that he himself had shot and killed Winnie Brown, and that when he told me that he pulled a handkerchief out of his pocket, which he had worn as a mask, and in my presence that he put the handkerchief in the stove. That was not true. I told them that Welch was there the same day of the shooting, and that I saw him. I did not mean to say that Welch put the handkerchief in the stove. I told them that Mrs. Geddes put it in the stove, and that I saw her do it, and I saw Welch give it to her. That she put the handkerchief in the stove is true, but the other ain't. It is not true about Welch being there at the time at all, but it is true about her putting the handkerchief in the stove. I gave it to her. I wore it myself. Mrs. Geddes gave it to me a week or two before the killing. Mrs. Geddes and I were alone at the ranch the evening of the day of the shooting. George Geddes was east then. I told Johnnie Stafford, Welch was the man who did the killing. That was not true. I told Judge Strevell that Welch killed Winnie Brown, and that he had been at the Geddes ranch on the evening of the killing. I said in that conversation that Welch in

my presence took out of his pocket a handkerchief, and said that he had used that as a mask when he shot Winnie Brown, and that he gave the handkerchief to Mrs. Geddes, and that she put it in the stove. That was not true. Mr. Porter told me in the presence of certain persons that Tom Welch could prove that he was not anywhere near the place where Winnie Brown was killed on the day of the shooting; and Stafford told me that there were seven men in the roundup on Otter creek that would swear that Welch was on the range with them on the day that Winnie Brown was shot, about forty miles away. The sheriff then told me that it would seem that I had been lying about this case. I said I would stick to what I had said, and I said, in substance, that, if Welch was not man enough to take his medicine, I would not care a —— whether they hung me, or what they did with me. I made a statement in the office of Strevell & Porter as to this case, and as to the killing of Winnie Brown. That was taken down by Miss Kennedy. I was sworn that day to tell the truth. Mr. Strevell, Mr. Porter, Mr. Gibb and Miss Kennedy were present. I had been in jail pretty nigh two weeks when the statement was made. In that statement I swore that Tom Welch had killed Winnie Brown. I swore that Welch came to the Geddes ranch the evening of the killing, and told Mrs. Geddes that he had shot Winnie Brown, and that he took out of his pocket a handkerchief that he said he had used as a mask, and that Mrs. Geddes burnt the handkerchief; and that Welch had used Geddes' new gun to kill Brown. I said that I had buried the cartridges, so they could not find any cartridges for that gun; that I did not have anything to do with the shooting or killing of Winnie Brown. I did not claim that I saw Welch shoot Brown. I did not think of swearing that I did the shooting myself until after Stafford told me that Welch could prove where he was on the day of the shooting, and that he was not anywhere near where it occurred. I knew that I would be found out that I killed the boy. I done it to kind of defend myself at first. I don't know whether I am doing it now to shield myself or not. I was not told that I would

not be hung if I went on the witness stand and made this statement. Nobody told me that nothing would save my neck. John Gibb, the sheriff, did tell me that I had better tell all I knew about it; that, if I did not, they would find it out on me, and that I would be hanged for it. They did not say who I should testify against, at all; left that to my own judgment. Mr. Merrill, my attorney, told me to go on the witness stand and tell the truth about this killing. I made a new story altogether, without being advised by anybody, which was taken down by Mr. Kreidler, the court stenographer. Some of it is like the statement I made in the office of Strevell & Porter; most of it is not. I put myself in place of Tom Welch at this time. I told them that I killed him. I don't think Tom Welch's name was mentioned in that room.  *  *  *  George Geddes was at the ranch at the time Mrs. Geddes talked to me about the $1,500. I do not know whether George heard it or not, but he was there. I am not sure whether it was the first time, or after he came back from Rosebud. I am sure that it was a $1,500 lawsuit that she spoke about to me. The third time that I saw Welch at the Geddes ranch was when Johnnie Stafford was there. George Geddes was there. Mrs. Geddes and I and George were there, and no one else. It was Welch that asked me first if I had seen the Brown boy; and Mrs. Geddes, next. No one else asked me. I reckon George Geddes could hear the conversation. He was there in the front room when we were talking. I think he could hear it, but he did not join in the conversation between Welch and I. Geddes wasn't doing nothing. He was sitting in a chair. I said Mrs. Geddes read the letter to me, wherein she asked him to send her fifty dollars; that she was in need of it. That was after she had offered me fifty dollars if I would get the Brown boy out of the way. I had not told her that I would do it for fifty dollars. Never told her that at all, and never told Welch that I would do it for him. I do not know what Mrs. Geddes wanted the fifty dollars for at the time she wrote the letter to Welch. I had been to Rosebud with her shortly before that. She borrowed fifteen dollars in Rosebud, and put up her watch,

and gave me the fifteen dollars to come to Miles City and buy things for her. She did not tell me that she wanted the fifteen dollars to redeem that watch. I do not know whether she used a part of that fifty dollars to redeem that watch. I was in jail when she got the money. George Geddes was crippled when I first went up there this summer; his arm was hurt, broke. I do not think he was very lame. His arm was not in splints when I went there. He had a pillow along, so that it would be easier for his arm. He said he was going east to have it fixed.''

The material parts of the redirect examination of the witness were as follows: ''Mrs. Geddes gave me the black silk handkerchief I wore about a week or two before the killing.' I was always friendly with Winnie Brown until I went up to Mr. Geddes' ranch.''

W. W. Neeley testified: ''That he met George Geddes about July 4th at Forsyth. That he was well acquainted with Geddes, and that Geddes told him that he had been at Miles City on some trouble; had been down there and given a bond for whipping a boy; that during the Indian trouble he tore or left down his bar, and tore down his fences, so that cattle got in and destroyed his crops, and he whipped him, and whipped him right. Geddes told me that he tied the boy up and whipped him.''

J. C. Anderson testified: ''That he conversed with the defendant about October 12th. That he asked defendant how he was getting on with his case in regard to whipping Brown and defendant said he had got it put off until the next term of court; that he had not presented his side of the case yet and, when he had, it would show up in a different light; that Brown had been talking about him and that this talk had got to stop; that if it did not there would be something ·happen, or words to that effect. In talking about the whipping of Brown, he said he was sorry that he did not kill him; that, if he had it to do over again he would. He said that Winnie had been talking about his family and he did not know why people did not leave his business alone, as he did not interfere

with anybody else and that if this talk did not stop there would something happen, or words to that effect." Witness said, "he did not know whether any one heard it or not. There was a man standing about six feet to the right of where Geddes and witness were standing at the time. Witness thought it was Dixon."

James Campbell, a deputy sheriff, testified that in October he served papers upon the defendant Geddes in the damage suits of Brown against Geddes and had a conversation on that day with Geddes. "Geddes brought up the matters of the suits—the damage suit in particular—and said he thought they were taking unfair advantage of him that day, when they knew that he was going away, and he said: 'Never mind, I will get even with the ——.'"

There was also introduced in behalf of the State, an information charging the defendant Geddes with the crime of assault in the first degree, committed on the 9th of June, 1897, upon the person of Winnie Brown, by whipping him with a blacksnake whip and striking him with a revolver. This information was filed July 20, 1897, and it appears the case was pending and undetermined at the time of the trial of the defendant herein. There was also introduced a complaint wherein Winnie Brown was plaintiff and this defendant, defendant, wherein plaintiff prayed for $5,000 damages by reason of the injuries received by the whipping referred to in the information.

The foregoing evidence was substantially that upon which the State relied for a conviction of the defendant Geddes, and upon which the jury must have predicated their verdict of guilty of murder in the second degree.

The defendant offered no testimony. It is conceded that Dixon was an accomplice and upon his testimony the State chiefly relied for a conviction. Section 2089 of the Penal Code provides as follows: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself and without the aid of the testimony of the accomplice, tends to connect the defendant with

the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.'' Whatever difference of opinion formerly existed as to what particular facts should be corroborated and the extent of the corroboration required, where convictions were asked for upon an accomplice's testimony, it is settled in this State by the statute quoted, that the corroboration must be evidence from an independent source and it must be such that this independent evidence in itself, without considering the testimony of the accomplice at all, tends to connect the defendant with the commission of the crime charged. Furthermore, it is not a satisfaction of the statute to corroborate an accomplice upon immaterial matters, or to prove merely that the crime charged has been committed, or the circumstance under which it has been committed; for there may be all such proof, and yet the additional essential evidence be lacking, which, independently of the evidence of the accomplice, leads to the inference that the defendant is connected in a criminal way with the commission of the crime. The statute is conformable to the rule laid down by Rosc. Cr. Ev. p. 122: ''That there should be some fact deposed to, independently altogether of the evidence of the accomplice, which taken by itself leads to the inference, not only that a crime has been committed, but that the prisoner is implicated in it.'' (*State* v. *Spencer* (Utah) 49 Pac. 302; *People* v. *Plath*, 100 N. Y. 590, 3 N. E. 790.)

Now, by the law, Geddes could not be convicted of advising and encouraging the murder of Winnie Brown, upon the uncorroborated evidence of Dixon; nor could he be convicted upon corroborative evidence merely going to show motive to murder. A man may be shown to bear malice in his heart towards another who is subsequently murdered, but that alone falls far short of proof sufficient to justify the conviction of one who bore the malice of the murder of the other. It was indispensable that there be corroboration which legitimately tended to show the material facts, necessary to authorize a conviction of Geddes as an accessory to the murder of Brown.

To validate the testimony of the accomplice, Dixon, it was also requisite that the corroboration must be to the person of the accused. ''Any other corroboration would be delusive,'' says Whart. Cr. Ev. Sec. 442, ''since, if corroboration in matters not connecting the accused with the offense were enough, a party who, on the case against him, would have no hope of escape, could by his mere oath transfer to another the conviction hanging over himself.''

To apply these rules accurately we must eliminate altogether the evidence of the accomplice, Dixon. Doing so, we have the following independent facts and circumstances:

1.   Geddes was informed against by the County Attorney for an assault upon Winnie Brown, committed several months before the homicide, and was sued in damages by Brown for the assault.

2.   Geddes, in conversation with certain persons weeks before the killing, admitted that he had whipped Brown and said that he was sorry he did not kill him.

3.   Geddes had his trial for the assault postponed and stated in a conversation that he had not yet presented his side but that when he did the case would appear in a different light.

4.   Geddes said, that if Brown did not stop talking about him, ''there would be something happen.''

5.   Geddes said, that by serving papers upon him in the civil suit for damages upon the eve of his departure for Chicago, they were taking unfair advantage of him and added: ''Never mind, I will get even with the ———.''

6.   Brown was shot and killed by Dixon.

Fully conceding the law to be that the corroborating evidence required, where an accomplice is the main witness for the State, need not be sufficient of itself to prove the guilt of an accessory, still, after a close examination of this record, we are forced to conclude that, unless resort be had to the testimony of Dixon, there is not sufficient evidence tending to connect Geddes with the crime of advising and encouraging this murder.   Geddes was away in Chicago when Dixon

killed Brown, having left Miles City nearly three weeks be-
fore November 4th.    There is no evidence of a conspiracy or
union of purpose to kill Brown between Geddes and Dixon.
The remarks of Geddes do not of themselves *prima facie* es-
tablish a conspiracy; nor is there a scintilla of evidence that
Geddes ever communicated with any person in the time of his
absence, or did any act or made any declaration in further-
ance of any concerted plan to do Brown violence; nor do we
find a word of independent testimony that Geddes intended to
have him killed by Dixon or any one else, or that he was
killed by Dixon at Geddes' instigation or direction; and,
finally, there is no evidence whatever, apart from Dixon's,
which goes to connect Geddes with the murder or with having
advised or encouraged it.    Three of the several statements of
Geddes to others than Dixon, included in the six independent
bits of evidence as set forth above, coupled with the fact that
he was charged with an assault, do show an ill will towards
the deceased and might furnish motive for murder; but they
utterly fail to corroborate the material statements of Dixon,
as required by the law heretofore discussed, assuming that
Dixon's testimony implicates Geddes at all.

The measure of proof is insufficient under the statute.
There is not enough to sustain a reasonable inference that
Geddes is implicated; wherefore the conviction is against the
law and this Court must set aside the judgment and award the
defendant a new trial, and it will be so ordered.

Geddes is charged as a principal.    The information con-
tains no allegation that he advised and encouraged, or aided
and abetted Dixon in committing the crime.    The admitted
fact is that Brown was murdered by Dixon, and that Geddes,
if connected with the homicide at all, was what the law once
regarded as an accessory.    Appellant raises the question
whether an information charging one simply as a principal is
sustained by evidence showing that defendant, if guilty of
anything, advised and encouraged the commission of the crime.
We hold such an information to be sufficient.    The common
law was otherwise, so far as it pertained to felonies (except

high treason), though in misdemeanors all the guilty persons were principals, and could be charged and proceeded against as such. (1 Bish. New Cr. Law, Sec. 685 *et seq.*) Bishop also writes, (Sec. 674, Bishop's New Cr. Law) that this distinguishing of the accessory before the fact from the principal is a pure technicality. "For in natural reason," he writes, "the procurer of a crime is not chargeable differently from the doer, and a familiar rule of the common law is that what one does through another's agency is regarded as done by himself. Even the common law of crimes makes no distinction in the punishment between a principal and an accessory —the offense of each being felony, of which the penalty was originally death. Likewise, in morals, there are circumstances wherein we attach more blame to the accessory before the fact than to his principal; as, where a husband commands his wife, or a master his servant, to do for his benefit a criminal thing, which, in his absence, is done reluctantly, through fear or affection overpowering a subject mind. We can only conjecture how this distinction came into the law; probably from the same confused apprehensions whence sprang the now exploded distinction between principals and accessories *at* the fact. Having, however, become established as a technical rule, it cannot be removed by the courts."

Penal Code, Sec. 1852, expressly abrogates the common-law distinctions referred to, and provides that "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, *must* be prosecuted, tried and punished as principals, *and no other facts need be alleged in any indictment or information against such an accessory, than are required in an indictment or information against his principal.*" Clearly, this explicit language is determinative of this feature of the case, and shows that the object of the Code was to put the principal and the agent upon the same legal ground, and to authorize the principal to be charged as if he himself had committed the felony in fact perpetrated by his agent by his advice and encouragement. (*Peo-*

*ple* v. *Bliven*, 112 N. Y. 79, 19 N. E. 638; *State* v. *Kent*, (N. D.) 62 N. W. 631.)

Constitutional rights guaranteed by Section 16, Art. III, of the Constitution, to the accused, to demand the nature and cause of the accusation, are not violated by the statute permitting an accusation against one as principal who is in fact an agent, for the reason that the old distinction between principal and accessory before the fact was merely arbitrary, and "without existence in natural reason or the ordinary doctrines of the law." (Bishop's New Criminal Law, Sec. 673.) "*Qui facit per alium, facit per se*," is the principle pervading the criminal as well as the civil law, and underlies the statute abolishing distinctions "more fanciful than real." (*People* v. *Bliven, supra.*) So, by abrogating these distinctions the statute has but done away with "pure technicality," in order to simplify the practice to harmonize with the advanced thought of the Codes, and we believe a charge against one formerly known as an "accessory before the fact" is good against him as principal. (*State* v. *Kent, supra.*)

The late decision of the Supreme Court of Washington in *State* v. *Gifford*, 53 Pac. 709, overruling an earlier decision of that court (*State* v. *Duncan*, 7 Wash. 336, 35 Pac. 117), is against the current of recent authorities, and the reasoning thereof seems to us to involve a *non sequitur* in this: It being true that he who perpetrates a crime through another's agency thus does it himself, proof that he advised and procured another to do it, is proof that he has done it himself; therefore, the charge against him as principal does not exclude an inference that he has done it through a third person, even though on the face of the pleading, by regarding the accused as a principal actor, an impossible state of affairs may appear—as, for instance, the charge of rape by a woman. The contrary argument leads to this: If one could not be a principal in the crime of rape, she could not be a principal if she advised and encouraged rape. But the law declares she shall be a principal, and why may not the law make a woman who aids and abets rape, guilty of rape, as well as the principal actor? The

Legislature had power to abrogate certain criminal distinctions, and establish others; and, though from certain aspects an absurdity may appear, from others a perfectly plain and specific charge is made, to which defendant must plead. (*State* v. *Rowe*, 104 Iowa, 324, 73 N. W. 833; *State* v. *Comstock*, 46 Iowa, 265; *U. S.* v. *Snyder*, 14 Fed. 554; *People* v. *Chapman*, 62 Mich. 280, 28 N. W. 896; *Boggus* v. *State*, 34 Ga. 275; *State* v. *Jones*, 83 N. C. 605.)

The court instructed, among other things, that under Section 41 of the Penal Code, which is the statute in regard to accessories, "it is sufficient if the accessories are cognizant of the purpose to commit the offense, and aid and abet or encourage or advise its perpetration, or, not being present, *advise or encourage* the commission of the offense," etc. The statute provides for those who have "*advised and encouraged*" the commission of the crime. The appellant contends that the word "and" appearing in the statute between the words "advise" and "encourage," cannot be converted into the word "or." We think that the conjunctive "and" ought to have been used, although the use of the disjunctive may not have been fatal to the instruction. In *People* v. *Dole* (Cal.) 51 Pac. 945, the court disapproved of the use of "or" instead of "and," although it doubted whether the use of the disjunctive misled the jury to defendant's prejudice.

When Dixon, co-defendant, was asked to testify as to alleged statements of Geddes, defendant's counsel objected until they had had an opportunity to examine Dixon as to what inducement had been held out to him to become a witness on the part of the State. The objection was overruled, and this ruling of court is assigned as error. It is strenuously urged that Dixon's testimony was incompetent, because he confessed in the course of his cross-examination that it was given under threats and inducements, and to admit it was error, upon the principle that, before a confession can be received in evidence, the court must be advised, in advance of its introduction, whether or not it was voluntary. We find no error in this ruling of the court. Section 2443 of the Penal Code permits.

an accomplice to be a witness for or against one jointly con-
cerned in the commission of an offense; while Section 3161,
Code of Civil Procedure, says that all persons (except certain
ones not material to be here considered) may be witnesses.
Dixon was, therefore, a competent witness, and, no matter how
strong was the proof which tended to show that he was threat-
ened or induced to testify as he did, all such facts could only
bear upon his credibility, and not upon his competency.
Dixon's testimony was not a confession. We believe that very
great latitude should be allowed in the cross-examination of an
accomplice, and that he should be subjected to a most severe
cross-examination as to his motives, inducements, and any con-
tradictory statements made; but he is not rendered incompe-
tent by reason of any immunity offered; nor is his testimony
subject to the rules governing admissions by the prisoner ac-
cused and then on trial. (*Vaughan* v. *State*, 57 Ark. 1, 20
S. W. 588; *Black* v. *State*, 59 Wis. 471, 18 N. W. 457;
*People* v. *O'Neill*, 5 N. Y. Cr. R. 302.)

The court allowed the State to read to the jury the informa-
tion filed against the defendant Geddes, charging him with an
assault upon Brown on June 9th. This assault was described
in that information as being a whipping administered to the
deceased, Brown, by the defendant Geddes, on June 9th, with
a horsewhip or mulewhip, and before the homicide, which is
the subject of the information in this case. The deceased,
Brown, had also commenced a civil suit for damages against
Geddes on account of the whipping above mentioned. The
State, against the objection of the defendant, also read in evi-
dence to the jury, the civil complaint in the assault case. This
was duly excepted to, and is assigned as error. Appellant
argues that the evidence of the whipping, being an offense
other than the one for which the defendant was being tried,
was inadmissible upon this trial. While it is thoroughly well
established that the commission of one crime cannot be proved
on the trial of a defendant for another, merely for the pur-
pose of inducing a belief in the minds of the jury that the ac-
cused is guilty of the crime for which he is being tried, on the

other hand it is a part of the criminal law that whatever testimony directly tends to establish the guilt of the person on trial of the crime charged is proper, even though it tends to show guilt of another distinct offense. Courts should be careful always to exclude evidence of collateral facts, lest the defendant be prejudiced by allowing the real issue to be obscured, and verdicts of conviction rendered on extraneous issues; but, if the facts introduced logically sustain a pertinent hypothesis, they are relevant, and should be allowed to go before the jury. Judge Brewer, for the Supreme Court of Kansas, in *State* v. *Adams,* 20 Kan. 311, said: ''A party cannot, by multiplying his crimes, diminish the volume of competent testimony against him;'' and the same learned Justice, in *Thiede* v. *Utah Territory,* 159 U. S. 510, 16 Sup. Ct. 62, has stated the rule that evidence of ill treatment by defendant of deceased, and of a state of bitter feeling, bears on the question of motive, and may be admitted as proper to be considered by the jury. Now, proof of the existence of an element of motive on Geddes' part was surely aided by showing what his feelings towards Brown were, as evidenced by the fact of the pendency of the information and civil action, wherein Brown necessarily would appear as a witness against him. (*People* v. *Buchanan,* 145 N. Y. 1, 39 N. E. 846; *Gillum* v. *State,* 62 Miss. 548.)

We believe, therefore, that the facts that Geddes had been charged with the assault and sued civilly for damages arising out it were competent and that the information and complaint could be produced and read for the purpose of showing a motive on Geddes' part; but the papers belonged to a species of evidence regarded as dangerous, not only because it compels a defendant to answer other accusations than those against him, and for which he is not on trial, but for the further reason that such evidence may be the moving cause of a conviction, which subverts the fundamental rule that a man cannot be convicted of one crime by proof his guilt of another; and we here lay it down that, for the reasons given, it is of the highest importance to a defendant's rights that, if such evi-

dence is admitted, its operation and effect must be cautiously restricted by the instructions of the court to the end that its legitimate sphere may be understood by the jury.  In *Martin* v. *Com.*, 93 Ky. 189, 19 S. W. 580, the court, in discussing a question exactly similar, well stated the rule which we adopt, and that should have governed the trial in this case.

"So it was competent to show in this case that the accused had been indicted for robbery at the instance of the deceased, but not to establish the offense by testimony of the facts necessary to show guilt, or to permit the entire record, including the affidavits for a continuance, to be read to the jury. The appellant was being tried for two offenses.  His guilt of robbery was permitted to be shown in order to fix upon him the crime of murder, and must have been prejudicial to his substantial rights.  This character of evidence is likely to be wrongfully considered by a jury, and made to constitute a part of the offense for which the party is being tried, as it might well be argued that one so depraved as to commit the crime of robbery would not hesitate to commit murder; and we think, therefore, proof of the charge of robbery, on the facts, with a view of showing guilt, was error.  Such evidence goes to the jury as a matter of necessity, for the purpose alone of showing motive on the part of the accused to commit crime, and no more than is necessary to show motive should be allowed, and then the jury told the purpose for which the evidence is to be considered by them."  (See, also, *Pinckord* v. *State*, 13 Tex. App. 478; *People* v. *Thompson*, 92 Cal. 506, 28 Pac. 589; Underhill on Cr. Ev. Sec. 323.)

Many errors are assigned by the giving of certain instructions.  We do not think it necessary to review them, inasmuch as, if a new trial is had, the charge of the court can be made to agree with the discussion of the several matters considered in this opinion.  The whole case is manifestly one where the law should be laid down as required by Section 3390, Code of Civil Procedure, which demands an instruction that "the testimony of an accomplice ought to be viewed with distrust and the evidence of the oral admissions of a party with caution."

The judgment is reversed and the cause remanded with directions to grant defendant a new trial.

*Reversed and remanded.*

BRANTLY, C. J., and PIGOTT, J., concur.

