STATE, RESPONDENT, *v.* DAEMS, APPELLANT.

(No. 7,240.)

(Submitted June 29, 1934. Decided July 24, 1934.)

[37 Pac. (2d) 322.]

488

*Mr. Norman R. Barncord* and *Messrs. Belden & DeKalb,* for Appellant, submitted a brief; *Mr. O. W. Belden* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Enor K. Matson,* Assistant Attorney General, for the State, submitted a brief; *Mr. Matson* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On October 23, 1933, a judgment of conviction of the crime of forgery was entered against L. R. Daems in the district court of Wheatland county; he has appealed from the judgment and from an order denying him a new trial.

The information on which Daems was tried is based upon a check issued by him against the funds of the James H. Duffey estate on October 24, 1928, at which time Daems was acting as attorney for the personal representatives of Duffey. The material facts developed at the trial are substantially as follows: James H. Duffey died at Harlowton on April 22, 1928, leaving a will in which he left his property to his brother Owen, who spells his name ''Duffy,'' and the six grown children of decedent, share and share alike; he nominated Owen Duffy and Sidonia Barnes, a daughter then residing at Bozeman,

"joint executors." The executors employed Daems to act for them. The will was admitted to probate, letters testamentary were issued to Duffy and Mrs. Barnes, who duly qualified on May 19, 1928. Appraisers were duly appointed and an inventory and appraisement executed. Notice to creditors was ordered and published, but neither the inventory nor affidavit of publication of notice to creditors was filed. The assets of the estate consisted of $166.17 in cash, a note for $4,000, which was appraised at $1,000 on the suggestion that the sum might be secured on a compromise, and certain other small notes which were found to be worthless. In addition to the foregoing, there were in the estate certain notes secured by a mortgage on a ranch which Duffey had theretofore sold to one J. P. Cooney, and which matured in July, 1928.

On qualifying, Owen Duffy signed a "signature card" at the bank in which James H. Duffey's small balance was carried, which card recites that he is the executor and Sidonia Barnes the executrix of the estate, and that "either or both to sign," and gives Duffy's address as "care L. R. Daems, city." This card was not signed by Mrs. Barnes. Duffy then gave Daems a check for $75 to meet immediate expenses of administration, and arrangements were made to have the Cooney notes taken up by the Federal Land Bank at Spokane. Some delay ensued by reason of objection to the title as shown by the abstract on the Duffey-Cooney ranch, but this was all cleared up early in October, 1928, and notice was received that the sum of $16,853 would be paid into the estate fund.

Seven claims, totaling approximately $1,000, were presented against the estate, principally for the expenses of burial and a tombstone, at Daems' office. Duffy, who was employed at herding sheep some thirty miles from Harlowton, called at the office before the money for the payment of the Cooney notes was received and was advised by Daems that the claims would be paid and that $2,000 could be distributed to each of the seven legatees as soon as the money was received, although it does not appear that the claims had been presented to the court for approval, that an order for the purchase of a tomb-

stone had been secured, or that the matter of partial distribution had been taken up with the court. Daems then told Duffy that, for his convenience, to save a second trip to town, he should sign a sufficient number of blank checks to permit him, Daems, to take care of these matters, which Duffy agreed to do and did. Two of the heirs were owing debts which they agreed should be paid from their distributive shares, so that, to take care of the above matters, some sixteen or seventeen blank checks were needed. Daems then induced Duffy to sign four additional blank checks; they differ as to the purpose to which these checks should be put. Duffy's testimony is that Daems told him that additional claims might be filed for small sums and that, with these checks in his possession, he would be able to take care of them as they came up.

Daems testified that "I informed him [Duffy] that I owed various persons in Harlowton for the labor and material used in the construction of an addition to my home and that I needed my attorney fees in order to pay each person. * * * Mr. Duffy said 'All right, you use what you want,' and as a result of that request he signed four additional checks."

On or about October 24 the sum of $16,853 having been deposited, Daems filled in and delivered checks as agreed upon, and filled in the four additional checks, three payable to himself for $700, $500 and $500, respectively, and one to the Urner Lumber Company for $626.55, in payment of an account owing by him to that firm. This last-mentioned check is charged in the information to be a forgery. All checks mentioned were presented to the bank for payment and paid out of the funds of the estate; the last check, being for a part of one of the distributive shares, was presented and paid on November 9, 1928, and caused an overdraft of $455.87, and on November 23 Daems deposited in the account the sum of $500, leaving a small balance on deposit. The bank statement, with all canceled vouchers, was mailed to Owen Duffy in care of Daems, who opened the envelope and kept the contents. Duffy testified that he did not at any time authorize Daems to open mail addressed to his care.

At the outset Daems had advised Duffy that the estate could be closed in a year. After the lapse of a year, according to Duffy, he called upon Daems, who told him that the estate would be closed as soon as the judge came to town, and for the next three years he made demand in that behalf five or six times a year, but each time was "put off" with some such statement as that first made.

In October, 1932, Duffy and Mrs. Barnes called jointly on Daems and demanded the production of the bank statement, the returned checks and a settlement. Daems finally produced eleven checks covering distribution to the heirs, but stated that he was unable to find the balance of the checks, which he said were "in the office and I will locate them." Daems testified to protracted search for the checks; they were never found and were not produced at the trial. Duffy testified that Daems "figured around all afternoon" with pencil and paper, and finally presented them with a statement from memory which included an item of $810.64 attorney's fees, which was not accepted by the representatives. Duffy returned home but instructed Mrs. Barnes to stay over until the next day and insist upon the production of the remaining vouchers and a settlement. On that day Daems drew up a final account in which he listed an executor's fee and a like amount as attorney's fees, but Mrs. Barnes stated that they had received no fee and did not want a fee. Daems then drew up a final account showing "cash on hand and received on notes '16,-016.00'" and debits—including "attorney fee $849.14"—of $15,928.64. Mrs. Barnes refused to sign the account and Daems signed it himself as "Attorney for Petitioners."

Mrs. Barnes secured a statement of the account from the bank showing the original balance of $166.17 and deposit to take up notes of $16,832.51, or a total credit of $16,998.68; the withdrawal of the full amount and $455.87 additional, and subsequent deposit of $500. This she took to Daems and went over the items of withdrawal with him and, for the first time, learned of the check issued to the Urner Lumber Company on his account. She testified that Daems told her that the Urner

check and the $700 were his, but that he did not remember what the two $500 checks "were made out for."

With reference to the statement which included executor's fees, Mrs. Barnes testified that Daems told her, "Of course, you know this isn't right but we have to make it show up that way, and I'll settle it and pay every dollar back; I want your folks' confidence and I don't want to be embarrassed in any way, and if you will let it go through that way I'll make it all right with you, and he said, 'I'm responsible for that money.' " She further testified that after going over the bank statement, Daems said he would waive his attorney fee rather than have trouble and would pay back every dollar the estate was short, would "sign a note or pay by the month, or settle any way we wanted him to that he could." He later made similar statements to Owen Duffy.

Mrs. Barnes, before returning home, turned the matter over to I. S. McQuitty, of Harlowton, who employed Emmett O'Sullivan, an attorney, and the representatives later signed a written withdrawal of Daems' authority and the substitution of O'Sullivan as their attorney.

McQuitty testified that he investigated the matter of the estate and found a shortage in the accounts and, with O'Sullivan, called upon Daems for an explanation and settlement; that Daems "confessed" to drawing the Urner check to pay his own account, and admitted drawing a check for $700 and another for $500 to himself; that Daems stated it was a serious matter and that he would "do anything to effect a settlement with the estate and make good the loss to the estate"; would either give his note or draw up an agreement for stated payments; he wanted time to make the loss good. This witness stated that he did not think either he or O'Sullivan mentioned criminal proceedings in their discussion with Daems, but that Daems did.

O'Sullivan testified along the same line and added that after the four checks issued for Daems' benefit were discussed, Daems said, "Boys, I am in wrong on the proposition; I know it; I know I am in line for the penitentiary too; I'll make a

clean breast of it, if I'm just given an opportunity—I don't want any trouble over it; I'll make any kind of a settlement that is satisfactory to the executors.'' The witness further stated that Daems said he had violated his instructions and had no authority to issue the check in question; that the money was gone but he would do all he could to make it good.

Daems' testimony, briefly summarized, is that he had thought that he would be able to collect the $4,000 note and would be entitled to 25 per cent. to 50 per cent. of the collection, and that for this and other extra work, added to the customary fee, he thought his fees should amount to around $1,800; when he realized that he had paid himself more than $2,300, ''with the consent of Mr. Duffy'' he returned $500 to the account; that later when he determined that the $4,000 note could not be collected, he decided that he was entitled to the same fee as the court would allow the executors. The defendant denied that he had filled in any of the blank checks for the purpose or with the intention of defrauding anyone. Considerable testimony was introduced with respect to the amount of extra work done by the defendant for the estate.

The first assignment is that the court erred in overruling defendant's demurrer to the information, which, it is contended, does not by its allegations charge facts constituting the crime of forgery.

The information alleges that Owen Duffy and Sidonia Barnes were executor and executrix, respectively, of the James H. Duffey estate, and as such employed Daems as their attorney; that Owen Duffy signed and entrusted the blank check set out in the information to Daems with instruction to fill in the date, the name of some creditor of the estate and the amount due such creditor, and to insert over the signature ''Owen Duffy'' the words ''James H. Duffey Estate,'' and below the signature the word ''Executor.'' That in disregard of his instructions, Daems ''falsely, fraudulently and feloniously'' inserted the name of a creditor of his own with the amount he was owing such creditor, and delivered the forged check to the Urner Lumber Company in payment of his debt, all with the intent

to cheat and defraud the executor Owen Duffy, Sidonia Barnes, the Urner Company and the bank.

Of course, Daems did not forge the check in the sense that it is entirely false and fictitious; it bore the genuine signature of Owen Duffy, who was authorized to sign checks at the bank on the estate fund, but the check may nevertheless be a forgery if Daems disobeyed his instructions in filling the blanks and did so with felonious intent.

In this connection defendant assigns error on the giving of an instruction that "where a person signs a check in blank, and entrusts it to his agent to fill in a particular name as payee, or a given amount, and the agent feloniously fills in a different name or a larger amount, he is guilty of forgery." This instruction is in the exact language of the rule announced in *State* v. *Alexander*, 73 Mont. 329, 236 Pac. 542, where, after the citation of authorities announcing the rule, this court continued: "If the agent does not have authority under any circumstances to write in the name or amount which he does write, there is not then any distinction, in principle, between the instrument which he issues over his principal's genuine signature and one to which he feloniously attaches his principal's signature." One may commit forgery by merely pasting the name of one person over that of another in a genuine instrument. (*State* v. *Robinson*, 16 N. J. L. 507.)

But it is urged that, in order to constitute forgery, the instrument must be such that, if genuine, it may injure another and it must appear from the information that it may be used to consummate a fraud; that, to be sufficient, without averring extrinsic matter, the information must "show on its face that it may be so used" (citing 12 Cal. Jur. 658), and that, under the statute (sec. 10062, Rev. Codes 1921), where there are two executors they must, except in certain instances, act jointly.

It is true that the information recites that there were two representatives of the James H. Duffey's estate, but this fact does not appear "on the face" of the check alleged to have been forged; on its face it shows that it could be used to

defraud, and, if fraud was committed, it was so used, for it was cashed at the bank and the money lost to the estate. "Apparent legal efficiency" is enough (*Ex parte Solway*, 82 Mont. 89, 265 Pac. 21; 2 Wharton's Criminal Law, 12th ed., sec. 887; 24 L. R. A. 33, note to *People* v. *Munroe*, 100 Cal. 664, 35 Pac. 326, 38 Am. St. Rep. 323, 24 L. R. A. 33.) In the *Farrell Case*, on which defendant relies, the instrument did not meet this requirement, as the seal of the clerk of the court, required to complete it, was not affixed. (*In re Farrell*, 36 Mont. 254, 92 Pac. 785.) It is the false making of an instrument with intent to defraud which constitutes forgery (sec. 11355, Rev. Codes 1921), and it is immaterial whether the attempted fraud is successful or unsuccessful. (1 Bishop's New Criminal Law, 572.)

It is contended that, as the signature on the check was genuine, neither the Urner Lumber Company nor the bank could be defrauded. While this may be true, it is immaterial; the allegation of intent to defraud them may be disregarded as surplusage, and if the balance sufficiently shows an intent to defraud Duffy and Mrs. Barnes, it justifies the verdict. (26 C. J. 935, and cases cited; 2 Bishop's New Criminal Law, secs. 425, 556; *State* v. *Cleaveland*, 6 Nev. 181; *McDonnell* v. *State*, 58 Ark. 242, 24 S. W. 105.)

Passing to the questions relating to the evidence, it is asserted that Daems was entitled to a fee, which, under the rules of court in the district, should be the same as that allowed an executor (sec. 10285, Rev. Codes 1921); that he had not been paid, had a lien for his fee, had the right to pay himself from his clients' funds, and that the facts "preclude elements of criminality."

Under our present law (secs. 9786, 10285, Rev. Codes 1921) the personal representative may pay an attorney his fee and thereafter be reimbursed on the filing of his account, or he may have the amount fixed and allowed before payment as an expense of administration, or the attorney may, upon direct application, have the court determine whether the services rendered were necessary, and, if necessary, fix and allow him

reasonable compensation therefor; the attorney is now "a person interested in the estate" and his claim for a reasonable compensation is a legal demand against the estate. (*In re McLure's Estate*, 68 Mont. 556, 220 Pac. 527.) It may then be that Daems had a lien against the estate property for his fee, but his compensation was not fixed and allowed either on petition of the personal representatives or on his direct application, and he had in his hands no fund from which he might retain a reasonable amount as his fee, as might have been the case had he collected the $4,000. The estate fund in the bank could be withdrawn only by the personal representatives, and the attorney had no control over it.

Had Daems been entitled to the full amount which he finally secured by means of the checks—$1,826.55—or even the additional $500 which he secured and thereafter returned to the estate fund, that fact would not constitute a defense to the charge of forgery if, in fact, the check described in the information was forged. (2 Wharton's Criminal Law, 12th ed., sec. 925.) In other words, Daems could not legally pay himself, or his creditor, in the manner in which he did, even though the claim so paid was a just one.

It is true that Daems testified that Duffy authorized him to fill in the four blank checks signed, in payment of his attorney fee, but this statement was flatly contradicted by Duffy, who testified that he signed those checks for possible use in paying claims which might be presented. This sharp conflict in the evidence was resolved by the jury in favor of Duffy's version of the conversation, and warranted the finding that Daems violated his instructions; the verdict based thereon cannot be disturbed.

It is urged that this evidence constitutes a departure from the allegations of the information. The information deals only with the Urner check, which was one of the four additional blanks signed, and which, under Duffy's version, was delivered to Daems with the instruction that it be completed by filling in the name of a creditor and the amount of such creditor's claim presented; this instruction was equivalent to an

instruction to fill in a name and amount designated in the particular check and did not constitute a variance. If the agent exceeded his authority and disobeyed his instructions by drawing the check in favor of a person not a creditor of the estate, with the intent to defraud the executor, such act constituted forgery under the authorities heretofore cited.

Finally error is predicated upon the giving of the following instruction: "Testimony has been admitted relating to certain forgeries other than those mentioned in the information. This testimony, in so far as it may tend to show the defendant guilty of such other offenses than that with which he is charged, must be disregarded by the jury, for he cannot be tried in this action for other offenses than the one charged. But such testimony is admitted solely for the purpose of assisting the jury in determining the knowledge and intent of the defendant in connection with the acts charged, if you find that he committed any such acts, and in determining whether such acts, if committed by him, were the result of accident or inadvertence, or were a part of a plan or system recently pursued by him." It is asserted that the final clause advised the jury that the defendant had been "recently"—just prior to the trial—working under a plan or system of which the issuance of the checks mentioned was a part; but, while not as clear as it might be, the instruction is not open to such construction; therein "recently" has reference to what he did at or about the time of the alleged offense, and the jury could not, in view of the facts, have understood the instruction otherwise.

The main objections urged against the instruction attack the opening sentence on the ground that it is "tantamount to telling the jury that in the instance of the check the defendant was guilty of forgery"; that all checks mentioned in the evidence were forgeries, and that it constitutes a comment on the evidence.

The phrase "forgeries other than" can have reference only to the three checks made out to Daems personally; there is no intimation in the evidence or in the instructions which

could have misled the jurors into believing that the court had referred to the checks which Daems filled out in accordance with his instructions, as forgeries. However, the court erred in referring to any of the acts of the defendant as ''forgeries''; whether or not forgery had been committed was the ultimate fact for determination by the jury. It has long been the rule in this state, as elsewhere, that a court may not instruct the jury as though a disputed fact had been proved (*State* v. *Sullivan*, 9 Mont. 174, 22 Pac. 1088), or comment on the weight of the evidence. (*State* v. *Lu Sing*, 34 Mont. 31, 85 Pac. 521, 9 Ann. Cas. 344.)

But the fact that the trial court incorporates an erroneous statement in his charge does not necessarily command a reversal of the judgment; as this court is required to ''give judgment without regard to technical errors * * * which do not affect the substantial rights of the parties.'' (Sec. 12125, Rev. Codes 1921.) The requirement is the same in civil cases (sec. 9191, Id.), and thereunder the rule is that ''in reviewing a charge of a trial court, it will be examined as a whole. While one or more paragraphs, standing alone, may be inaccurate or even erroneous, yet if these are qualified and explained by other portions of the charge *in pari materia*, and, taken together with them and the rest of the charge, fully and fairly submit the case to the jury, the verdict and judgment should be sustained.'' (*Harrington* v. *Butte, A. & P. Ry. Co.*, 36 Mont. 478, 93 Pac. 640; *Sherris* v. *Northern Pacific Ry. Co.*, 55 Mont. 189, 175 Pac. 269; *Loncar* v. *National Union Fire Ins. Co.*, 84 Mont. 141, 274 Pac. 844.) So also in criminal cases, if the charge as a whole fairly leaves the disputed facts to the determination of the jury, and it does not appear that the jurors have been misled by the assumption of a fact as true, and it appears from the whole case that substantial justice has been done, the technical error committed will not work a reversal. (*State* v. *Hecox*, 83 Mo. 531; *State* v. *Ayers*, 86 S. C. 426, 68 S. E. 625; *State* v. *Maloy*, 44 Iowa, 104; *Pettus* v. *State*, 58 Tex. Crim. App. 546, 126 S. W. 868, 137 Am. St. Rep. 978.)

While this court has never had occasion to announce the foregoing rule in a criminal case, it is indicated in the significant language used in *State* v. *Allen,* 34 Mont. 403, 87 Pac. 177, wherein, having held that an instruction designating one Maxwell as an accomplice assumed that a crime had been committed and that defendant was guilty and was "clearly erroneous," it declared that "other portions of the charge fully and fairly submitted the question of complicity to the jury and they may not have been misled by the assumption, but the error should be avoided in another trial," which was granted on other grounds. In a personal injury case (*Leonard* v. *City of Butte,* 25 Mont. 410, 65 Pac. 425) the rule was applied to an instruction in which the court clearly erred, this court saying: "The expressions 'the defect' and 'the unsafe condition' were inadvertently used, the court thus speaking for the moment as if the alleged defect stood as an admitted fact, * * * but taking the whole charge together, we do not think the defendant has suffered prejudice."

Herein the objectionable phrase was not used in advising the jury as to its duty with reference to the charge against the defendant and the proof necessary to establish that charge, but was merely introductory to the statement of the well-established rule respecting evidence of other alleged offenses. (*State* v. *Geddes,* 22 Mont. 68, 55 Pac. 919; *State* v. *Wyman,* 56 Mont. 600, 186 Pac. 1; *State* v. *Hopkins,* 68 Mont. 504, 219 Pac. 1106.)

Barring the introduction, the instruction safeguarded the language used, by such expressions as "which may tend" to show guilt; "if you find that he committed any such acts," and "if committed by him," while all "other portions" of the charge were free from error and fully and fairly defined the crime charged and instructed the jury as to the proof necessary to establish the alleged crime "beyond a reasonable doubt" in order to warrant a conviction.

It cannot be presumed that the jury seized upon the one objectionable sentence in the charge as warranting them to declare the defendant guilty of forgery, and disregarded the

painstaking efforts of the court to guide their deliberations in arriving at such conclusion.

Under the charge as a whole, the jury could not but have fully understood that they were to determine whether they would believe Daems or Duffy as to the purpose of the signing of the four additional checks, and that on that determination depended the question of obedience to, or violation of, the instructions given, and that of guilt or innocence. That the jurors did not consider the erroneous instruction as advising them of Daems' guilt is indicated, in a measure, by the fact that they were out between two and three hours before returning the verdict of guilty. We fail to see how the substantial rights of the defendant were affected by the inadvertence of the trial court; further, a careful reading of the record will convince any ordinarily intelligent man that substantial justice has been done. The cold record of the manner in which the defendant sought to cover up the issuance of the four checks when called upon for a statement, by showing the cash receipts practically a thousand dollars less · than the court records and the bank statement showed them to be, and failing to list the checks in the debit column and thus hoodwink the executor, goes far to justify the verdict. We feel that, in the words of the South Carolina court (*State* v. *Ayers,* above), "to order a new trial for such an inadvertence * * * would be trifling with the administration of justice."

Judgment affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.

Rehearing denied November 13, 1934.