Argued July 20, decided August 10, rehearing denied October 5, 1909.

### STATE *v.* FINCH.

[103 Pac. 505.]

CRIMINAL LAW—TRIAL—TIME TO PREPARE.

1. Where a coroner's inquest was held shortly after the killing, at which accused's principal counsel was present, and several counsel, who represented accused on his final trial, were present at the preliminary examination, which was held a week after the killing, the court did not err in compelling accused to go to trial within eight days after the finding of the indictment, on the theory that his counsel had had insufficient time to prepare, though they had not been formally retained until after the indictment was found.

CRIMINAL LAW—CONTINUANCE—ABSENCE OF WITNESSES

2. The testimony of one of defendant's absent witnesses, for whom a continuance was asked, was taken by deposition, by consent of the State, and the affidavit stated that the other had left the State, and would not return under six weeks, but did not state the probable time of his return. Though the case was set for December 18, 1908, no subpœna was issued for the witness until on the 16th, leaving a delay unaccounted for of five or six days, nor did the application show the relevancy of the absent testimony to defendant's supposed defense. *Held*, that the denial of the application was not an abuse of discretion.

CRIMINAL LAW — CONTINUANCE — DENIAL — DISCRETION — AFFIDAVITS — BILL OF EXCEPTIONS.

3. Refusal of an application for a continuance will not be disturbed on appeal, except for abuse of discretion. Affidavits for continuance cannot be considered on appeal, unless made a part of the record by the bill of exceptions.

CRIMINAL LAW—EVIDENCE—OTHER OFFENSES—MOTIVE.

4. Where the defendant's act in killing deceased arose from the persistence of deceased's prosecution of defendant, resulting in his suspension from practice as an attorney, the record showing the charges preferred by deceased as prosecutor for the State Bar Association against defendant, accusing him of drunkenness while trying a case in court, the issuance of checks on a bank where he had no funds, and of unlawfully affixing a notarial seal to certain pension papers, etc., was competent as evidence of motive, though it showed defendant was guilty of other offenses.

CRIMINAL LAW—APPEAL—RIGHT TO ALLEGE ERROR.

5. Accused was not entitled to claim that the introduction of the record of his prosecution by deceased, for conduct unbecoming an attorney, which was the cause of the killing, was error, where he himself introduced the record of the preliminary hearing of the same charges before the grievance committee of the Bar Association, which was substantially the same as the record introduced by the State.

HOMICIDE—MOTIVE—EVIDENCE.

6. Where, in a prosecution for homicide, the court permitted evidence of a prosecution of defendant by deceased, for conduct unbecoming an attorney, to show motive for the killing, the truth of the charges in such proceeding was not in issue, and the court properly refused to permit defendant to go into the merits thereof.

CRIMINAL LAW—EVIDENCE—LOCUS IN QUO—PLAT.

7. In a prosecution for homicide, a plat of decedent's office, drawn to a scale by an expert, and shown by his testimony to be a generally fair and accurate representation of the *locus in quo* shortly after the homicide, was admissible, not as substantive evidence, but to aid in understanding the testimony.

CRIMINAL LAW—EVIDENCE—PHOTOGRAPH OF DECEASED.

8. Where the physician who performed the autopsy was not personally acquainted with deceased, the court properly permitted a photograph, proven to be a correct likeness of deceased, taken in health, to be introduced to identify the body of the person on whom the autopsy was performed as that of deceased.

CRIMINAL LAW—PAROL EVIDENCE.

9. Where defendant killed deceased because of the latter's zeal in prosecuting charges against defendant for disbarment, and it did not appear that

deceased's appointment as prosecutor for the Bar Association was other than oral, or that it had records of any kind, the fact that deceased was prosecutor for the association was provable by parol.

CRIMINAL LAW—STATEMENTS OF COUNSEL.

10. That special counsel for the State, in the course of an argument to the court, said that defendant "shot Fisher down" was not error; the court having promptly directed the jury to disregard the language.

WITNESSES—CROSS-EXAMINATION—BIAS.

11. Where witness for defendant, who was confined in jail when defendant was received, accused of killing deceased, testified to bruises and contusions on defendant's face and head when he first entered the jail, and that there was a hole or cut in defendant's hat, to corroborate defendant's theory that deceased had struck him on the head with a seal, and that the shooting was in self-defense, the State was properly allowed to ask the witness on cross-examination if he had not, in a conversation with a newspaper reporter, requested the reporter to visit deceased's office, and ascertain if there was a seal there, and, if so, to examine as to whether there was dust on it, etc., as tending to show bias.

CRIMINAL LAW—APPEAL—HARMLESS ERROR.

12. Section 856, B. & C. Comp., provides that the judge himself, or any juror, may be called as a witness by either party, but in the former case it is within the discretion of the court or judge to order the trial to be postponed or suspended, and to take place before another judge. *Held* that, where in a prosecution for homicide a juror was called from the box, and the judge from the bench, by defendants to testify concerning trifling and inconsequential matters, the fact that the judge did not suspend the trial and direct it to be continued before another judge, while he was testifying, and that only eleven jurors were in the box while the juror was testifying, was immaterial.

HOMICIDE—SELF-DEFENSE—INSTRUCTIONS.

13. An instruction that, unless defendant's fear of great bodily harm, or great danger to his life, was such that a reasonably prudent man would have entertained under all the circumstances, then his act in striking the fatal blow was not justifiable or excusable, properly stated the law.

CRIMINAL LAW—INSTRUCTIONS—POLLING JURY.

14. Where the bill of exceptions showed that all the jurors were present at the convening of court, and trial was not at any time allowed to proceed without all the jurors, the defendant and his counsel being present, and that all the jury were present when the instructions were given, an objection that the jury was not polled before the court gave its instructions was frivolous.

GRAND JURY—RIGHT TO IMPANEL—INDICTMENT.

15. Where the court ordered a grand jury to be regularly drawn, and accused was indicted thereby, it was not material whether the constitutional amendment of June 1, 1908, providing that thereafter no person should be charged in the circuit court with any crime except by indictment by grand jury, was then in force, since the statute previously existing, and permitting the commencement of a criminal action by information, also permitted the court in its discretion to call a grand jury.

CRIMINAL LAW—RIGHT TO COMPETENT COUNSEL.

16. Where defendant himself was a lawyer of several years' standing, and his partner had been a practicing attorney of the Supreme Court for a number of years, and in addition he had the services of a former district attorney and two other lawyers, who both exhibited knowledge of law and experience in criminal trials, an objection that he was not represented by competent counsel was unsustainable.

HOMICIDE—CAPITAL PUNISHMENT—CONSTITUTIONAL PROVISIONS.

17. Section 15, Article I, Constitution of Oregon, declaring that laws for the punishment of crime shall be founded on principles of reformation, and not vindictive justice, when construed with Section 11, Article V, authorizing the Governor to grant reprieves, which are applicable only in capital cases, does not impliedly prohibit the infliction of the death penalty as punishment for murder in the first degree.

PARDON —"REPRIEVE."

18. A "reprieve" is a respite by the Governor from a sentence of death.

HOMICIDE—CRIMINAL LAW—PRESUMPTION—CAPITAL PUNISHMENT.

19. Where a constitutional provision has been copied from the constitution of another state, after it has been construed by the courts of that state, it will be presumed to have been adopted with the construction placed upon it by the courts of the state where it originated, and it must be regarded as settled in this State that the legislature derives authority from the constitution to enact laws for the infliction of punishment by death, in proper cases.

From Multnomah: EARL C. BRONAUGH, Judge.

The defendant, J. A. Finch, was indicted by the grand jury of Multnomah County for murder in the first degree, in the killing of one Ralph D. Fisher. A trial resulted in his conviction as charged and, having been sentenced to death, he appealed.                    AFFIRMED.

For appellant there was a brief over the names of *Mr. John A. Jeffrey, Mr. Charles E. Lenon,* and *Mr. C. A. Ambrose,* with oral arguments by *Mr. Jeffrey* and *Mr. Lenon.*

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. George J. Cameron,* District Attorney, and *Mr. John J. Fitzgerald,* Deputy District Attorney, with oral arguments by *Mr. Fitzgerald* and *Mr. Arthur C. Spencer.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

The assignments of error in this case being more fully stated in the reply brief filed by defendant's counsel, we will consider them in the order in which they are therein set forth.

1. The first assignment is that the court erred in compelling the defendant to go to trial within eight days from the finding of the indictment. The killing of Fisher

and consequent arrest of defendant, occurred on the 28th day of November, 1908. A short time subsequent to this the coroner's inquest was held, and the principal counsel for defendant was present. It also appears that several of the counsel who represented defendant on the final trial were present at the preliminary examination, which was held a week after the killing, so that, while it may have been true that counsel had not been formally retained until defendant was indicted, it is evident that they had been active theretofore in the case and had every opportunity to become familiar with it, and the manner in which they conducted the defense showed that such opportunity had not been neglected.

2. The question of granting a continuance on the ground of the absence of material witnesses was one addressed to the sound discretion of the trial court. It appears that the witnesses desired by defendant were all actually present at the trial except two, Mrs. May Finch and C. H. Piggott, and that the testimony of Mrs. Finch was taken by deposition by consent of the State, leaving Piggott the only witness whose testimony was not available on the trial. Mrs. Finch and the defendant both testified to the same state of facts which the defense claimed could be established by Piggott's testimony, and they were not contradicted by any witness. The affidavit for continuance did not indicate clearly the probable time of Piggott's return to the State, merely stating that he had gone to California and would not return under six weeks, but not indicating whether or not he was likely to return after that period. It also showed that, although the trial had been set for the 18th day of December, no subpoena had been issued until the 16th, thus showing that five or six days had been wasted before any subpoena had been issued. The affidavit did not show the relation of the testimony of Piggott to the proposed defense, or that it had any relevancy to it whatever. In the light of the testimony subsequently adduced and the defense made

it can now be seen that the desired testimony would have been relevant, but the court could not know this before the trial, unless the affidavit set forth enough of the theory of the defense to enable the court to judge from the affidavit itself as to the probable materiality of the testimony. The further statement in the affidavit as to the excited state of the public mind and prejudice against defendant, by reason of inflammatory articles and cartoons in the newspapers, were matters of which the court below was in a much better position to judge than we are. None of the alleged articles or cartoons are attached to the affidavits, so that neither this court, nor the court below is able to say from actual inspection of them whether or not they were of such a character as to greatly influence public opinion, or prejudice a jury against the defendant. The fact that no exception is taken to any ruling of the court upon the acceptance or rejection of any juror indicates that a jury believed by both parties to have been fair and impartial was secured in the case.

3. The granting or refusing of a motion for continuance is a matter in the discretion of the trial court, and will not be disturbed on appeal, except for an abuse of that discretion: 4 Enc. Pl. & Pr. 835; State v. O'Neil, 13 Or. 183 (9 Pac. 284) ; State v. Howe, 27 Or. 138 (44 Pac. 672) ; State v. Huffman, 39 Or. 48 (63 Pac. 1). We are unable to see any abuse of discretion in the action of the court below. While we have treated this assignment as though it had been regularly before us, as a matter of strict practice it is not. The affidavits for continuance are not made a part of the bill of exceptions, but merely come here with the transcript. This court has held that, if review of the decision on a motion refusing a continuance is desired here, the affidavits must be made part of the bill of exceptions: State v. Kline, 50 Or. 426 (93 Pac. 237).

4. The next assignment of error relates to the ruling of the court permitting the introduction of the record of certain disbarment proceedings against defendant in the Supreme Court. The prosecution offered a record showing certain charges preferred by deceased as prosecutor for the State Bar Association against defendant, accusing him, among other things, of drunkenness while trying a case in court; of issuing checks upon a bank wherein he had no funds; and of unlawfully affixing a notarial seal to certain pension papers; and also offered defendant's answer thereto, his plea and the final judgment of the court suspending him from practice. This record was admitted, over defendant's objection as to its competency and materiality, coupled with a specific objection that it tended to prove the bad character of defendant, and to show that he had been guilty of other offenses than the one for which he was on trial, and was therefore highly prejudicial. It is plain from the evidence that the difficulty between defendant and deceased arose out of the disbarment proceedings prosecuted by deceased against defendant. The theory of the State was that defendant, being incensed at the prominent part deceased had taken in preferring charges of professional misconduct and dishonesty against him, in prosecuting them to final judgment, and thereafter refusing to sign a petition for his reinstatement as an attorney, sought him out and killed him as a matter of revenge; in other words, that these acts of the deceased and their results to defendant furnished the motive which actuated defendant to perpetrate the fatal act.

5. Evidence of motive, while not absolutely essential, is always admissable in prosecutions for murder. "When the *corpus delicti* has been proved in a prosecution for homicide, and the circumstances indicate that the accused was the perpetrator of the homicide, facts tending, even though remotely, to show a motive are admissable against him, though the jury should exercise great cau-

tion in such proof. And all evidence of whatsoever nature tending to throw light upon the relations existing between the accused and the deceased and the feeling between them is competent; the remoteness of the evidence of motive going to its weight, and not its admissibility. Though not necessary to the existence of malice in homicide, motive is frequently a constitutent element of it, and the presence or absence of motive is always a subject of proof as a means of establishing the presence or absence of malice": Wharton, Homicide (3 ed.), 595. Defendant's counsel, while admitting this general proposition, contends that such proof cannot go to the extent of showing that defendant has been guilty of committing other offenses, but in this contention he is not borne out by the authorities. "Proof of the commission of another crime may be given when it tends to show motive for the homicide in question": Wharton, Homicide, § 596. Evidence of this character has been frequently admitted where the claim of the State was that the homicide had been committed in revenge, on account of ill feeling growing out of litigation or criminal prosecutions: *State* v. *Geddes,* 22 Mont. 68 (55 Pac. 919) ; *State* v. *Bodie,* 33 S. C. 117 (11 S. E. 624) ; *State* v. *Welch,* 22 Mont. 92 (55 Pac. 927) ; *Butler* v. *State,* 91 Ga. 161 (16 S. E. 984) ; *Gillum* v. *State,* 62 Miss. 547. In all of the above-cited cases the record was admitted in evidence, the same as was done in the case at bar.

In the case of *State* v. *Bodie,* 33 S. C. 117 (11 S. E. 624), the record introduced consisted of an affidavit, filed by deceased for the arrest of the defendant, the warrant of arrest issued thereon, the testimony of the State's witnesses, the recognizance given by the defendant, the indictment found in the trial court and the *nolle prosequi* thereof by the district attorney. The Supreme Court of South Carolina held all these competent, except the testimony of the State's witnesses. In *Butler* v. *State,* 91 Ga. 161 (16 S. E. 984), a warrant charging defendant with

adultery, and his recognizance under it, were held to be competent as showing motive for killing the deceased, who had procured such warrant to be issued. In *State* v. *Geddes,* 22 Mont. 68 (55 Pac. 919), an information was introduced in evidence charging defendant with an assault upon deceased, and also a complaint in a civil action by deceased against the defendant growing out of the assault. Both these were held competent evidence, as tending to show the state of feeling between the parties, and therefore a motive for the killing. Authorities on this subject might be multiplied, but further citations are needless. It is apparent from the evidence that the deceased, both before the grievance committee of the Bar Association and the Supreme Court, had vigorously prosecuted defendant for misconduct as an attorney; that he had filed accusations against him that, whether true or false, would have had a tendency to cause ill feeling against him on the part of the defendant; that he had followed these up to a final judgment of suspension from practice. The record was competent evidence to prove this, though it is possible that some portions of it could also have been proved by parol. It is true that the tendency of such evidence may have been to show that defendant had been guilty of other offenses than murder, but evidence, otherwise relevant, should not be excluded merely because the effect of it may be to show that the party on trial has multiplied his crimes. The judge presiding at the trial very impressively admonished the jury that the evidence was not admitted for the purpose of showing the bad character of the defendant, but solely for the purpose of showing motive, and that they were to consider it for that purpose only. This admonition was twice given during the trial, and again repeated in the charge, and every effort possible was made to confine the effect of the evidence to the purposes for which it was admitted. In addition to the fact that the evidence above adverted to was entirely

competent, the defendant introduced the record of the preliminary hearing of these same charges before the grievance committee of the Bar Association, which was substantially identical with the record introduced by the State and commented upon and explained it at great length. Even if the introduction of the first record had been error, which it was not, the introduction by defendant of this second record, which the bill of exceptions shows to have been practically a duplicate of the first, would have cured it.

6. The next assignment relates to the alleged refusal of the court to allow defendant to explain the record in the disbarment proceedings, and to discuss the merits of the charges against him after the record had been received in evidence. The truth of the charges filed was not a matter in issue. Had they been utterly false their effect to inflame the defendant's mind would probably have been as great, or greater, than if they had been true. The record was not introduced for the purpose of showing that defendant was a man of bad character, but for the purpose of showing the feeling and general relations of defendant with deceased; and, their truth or falsity not being material, the court might perhaps have been justified in refusing to allow testimony on that subject. But while the court at one stage of the case refused to allow defendant to go into explanations in regard to the charges, later on it did permit him to do so, and to explain how he came to draw the checks mentioned in one of the charges, and to call Snyder, one of the firm who cashed the alleged fraudulent checks, who testified as to everything that he personally knew about the transaction.

7. There was no error in allowing the plats of Fisher's office to be introduced in evidence. They were offered, not as substantive testimony as to any fact, but to enable the witnesses to point out more clearly the location of the desk, chairs, safe and doors, and thereby to give

the jury a general idea of the situation. They were drawn to a scale by an- expert and shown by his testimony to be a generally fair and accurate representation of the *locus in quo* shortly after the homicide. Other witnesses testified as to their substantial correctness as showing the situation at the time of the homicide, and out of many witnesses, both for the State and the defendant, who referred to the maps in the course of their testimony, the only criticism that we now recall was that of one witness, who thought the location of Fisher's desk might be a few inches out of the way.

8. Another assignment is that the court erred in allowing a photograph of deceased to be introduced in evidence. The physician who performed the autopsy was not personally acquainted with deceased, and only knew that he had performed an autopsy on the body of some person unknown to him. A photograph of deceased, proven to be a correct likeness, was shown him, and he then testified that the person upon whom he performed the autopsy was the same person represented in the photograph. For the same purpose of identification the photograph was also shown to other witnesses. It was a picture showing deceased in health and strength, and was not in any way calculated to excite the passions or sympathy of the jury. In *State* v. *Miller,* 43 Or. 325 (74 Pac. 658), a photograph showing a number of gunshot wounds on the body of the deceased and presenting what the court calls "a grewsome spectacle," was introduced without any apparent necessity, and without proof of its correctness. The court held that under the circumstances its introduction tended unnecessarily to inflame the jury against defendant and that its admission was error. But in this case the purpose for which the picture was introduced was proper, and there was nothing in any way calculated to prejudice defendant's case in exhibiting it to the jury.

9. The next assignment is in relation to the ruling of the court admitting in evidence an attempt to disbar defendant in another proceeding that had been dismissed. The remark heretofore made in relation to the record from the Supreme Court will apply also to this proceeding. Deceased had been connected with it, and it was therefore admissible for the same reason that the other record was admissible. Another assignment predicates error upon the ruling of the court admitting oral testimony showing that deceased was the prosecutor for the State Bar Association. There is nothing in the record showing that his appointment was other than oral, or indicating that the association has any records of any kind. The objection is not tenable.

10. Another assignment alleges that the court erred in allowing the special prosecutor to say that defendant "shot Fisher down." The answer to this is that the court did not "allow" the prosecutor to say the words imputed to him. It appears from the bill of exceptions that the words were uttered in the course of an argument to the court; and, when defendant's counsel objected, the court promptly directed the jury to disregard the language.

11. Another assignment challenges the ruling of the court in allowing the prosecution to cross-examine Martin, a witness for the defense, in regard to a conversation between himself and Smith, a reporter for the Daily Journal. Martin, who was confined in the jail when defendant was received there, testified to certain bruises and contusions, which he claimed were upon defendant's face and head when he first entered the jail; and also testified that there was a hole or cut in defendant's hat; the evident object of the testimony being to corroborate the theory of defendant that Fisher had struck him on the head with a seal, and that the shooting was in self-defense. To show Martin's bias and interest in the case, and his active partisanship therein on behalf of the defendant, the State asked him on cross-examination if

he had not requested the reporter to visit Fisher's office and ascertain if there was a seal there, and, if so, to examine as to whether there was any dust on it, and other matters along the same line of inquiry. Acts or conversations with third parties tending to show active interest and partisanship on the part of a witness in favor of the party for whom he is called, are always admissible as tending to show bias, and therefore going to the weight and credibility of his testimony. The evidence was properly admitted.

12. The next assignment predicates error upon the fact that one of the jurors was called as a witness, leaving, as the counsel puts it, "only 11 jurors in the box," and that the judge was called as a witness and testified "with no judge on the bench." Both the juror and the judge were called by the defendant, and both of them upon such trifling and inconsequential matters as to leave the impression that counsel, in their zeal for their client, were seeking to get an error into the record, with a view of taking advantage of it afterwards. Criminals would find an easy method of evading justice if the law were so farcically technical that the trial could be brought to a standstill and a retrial obtained by the simple expedient of calling a juror as a witness. Fortunately our laws provide for just such an exigency (Section 856, B. & C. Comp.), as follows: "The judge himself, or any juror, may be called as a witness by either party, but in the former case it is in the discretion of the court or judge to order the trial to be postponed or suspended, and to take place before another judge." Considering the trivial nature of the evidence elicited from the judge in the case at bar, he would have been guilty of a gross abuse of discretion had he postponed the trial to call another judge in his place. This section has been under consideration by this court, and the fact of the presiding judge testifying was held not to be error: *State* v. *Houghton,* 45 Or. 110 (75 Pac. 887).

13. Another alleged error is predicated upon the giving by the court of the following instruction: "But unless you find that defendant's fears of great bodily harm or danger to his life were such as a reasonably prudent man would have entertained under all the circumstances, then his act in striking the fatal blow was not justifiable or excusable, and you should find him guilty." The part of the charge excepted to is but an excerpt from the whole given on the subject, and is preceded by a long, careful and exceedingly fair exposition of the law of self-defense, and of the different degrees of homicide, but, taking it even as it stands above, it correctly states the law: Wharton, Homicide (3 ed.), p. 358; State v. Smith, 43 Or. 110 (71 Pac. 973). The requests of the defendant for special instructions were included in the general charge, so far as they were proper, and there was no error in refusing those not so given.

14. The next exception is that the jury were not polled before the court gave its instructions. The affidavits of the defendant's counsel are in the transcript, but they carefully avoid saying that any juryman was absent. The bill of exceptions shows that all the jurors were present at the convening of court and that the trial was not at any time allowed to proceed without all the jurors, the defendant and his counsel being present. The transcript also shows that the jury were all present when the instructions were given, and the objection is frivolous.

15. The objection as to the irregularity of the grand jury is not well taken. Previous to the adoption of the constitutional amendment of June 1, 1908, the statute permitted the commencement of a criminal action by information, but provided that the court might, in its discretion, call a grand jury. The amendment above mentioned provided that thereafter no person should be charged in the circuit court with the commission of any crime except by indictment by a grand jury. The effect

of this constitutional amendment was not to repeal the previous law allowing courts to call a grand jury in their discretion, but to make that mandatory which had previously been directory. It appears from the transcript that the court ordered a grand jury to be regularly drawn, and it makes no difference whether the amendment was then in force or not; in either case the right to impanel a grand jury existed.

16. The next objection is that defendant was not represented by competent counsel. The defendant himself was a lawyer of several years' standing. Mr. Piggott, his partner, has also been a practicing attorney of this court for a number of years. In addition, he had also Mr. C. F. Lord, formerly district attorney for Multnomah County; Mr. Holcomb and Mr. Campbell, who both exhibited knowledge of law and experience in criminal trials. These attorneys were of his own choosing, and the record here shows that they defended him intelligently and zealously, and that everything was done that any attorney could probably have done to protect his interests and secure for him a fair trial. That they failed, after an intelligent and faithful effort, to secure his acquittal is not surprising, in view of the testimony disclosed in the record.

17. The last suggestion is that the infliction of the death penalty is contrary to Section 15, Article I, of the Constitution of this State. The section reads as follows: "Laws for the punishment of crime shall be founded on the principles of reformation and not of vindictive justice." The language used in this section not being entirely unambiguous, and not indicating clearly by its terms the effect that its framers intended it to have upon existing and future legislation, it becomes necessary to define the terms used therein, and to ascertain, through application of the usual methods of legal interpretation the design of its framers and the scope of its operation. There are three canons of interpretation that may be

applied to this section; and, tested by either of these, the contention of defendant's counsel cannot be sustained.

The first test, and one to which great weight is to be attached, is contemporaneous construction, and long acquiescence by the courts and legislatures: Endlich, Interpretation of Statutes, § 527. The present constitution was framed and adopted in 1857, and the State was admitted into the Union in 1859. By the provisions of the constitution the laws of the territory of Oregon were continued in force "so far as applicable" under the State government. The territorial law inflicted the death penalty for murder in the first degree, and no change was made in that penalty, or in the law itself, until the adoption of the Codes of 1864, when the same law, with the same penalty was re-enacted, with some slight amendments. During the interval the death penalty was not infrequently imposed and carried into effect. Among the members of the constitutional convention were Judges Boise, Prim, Shattuck, Kelly, Kelsay and Wait, all of whom were afterwards members of the Supreme Court of this State, and all of whom, excepting Judge Kelly, performed circuit duty. It is part of the judicial history of this State that all of these eminent jurists either pronounced the sentence of death while upon circuit duty, or participated in affirming such judgments when sitting upon the supreme bench. Rousseau well observes that "He who made the law knows best how it ought to be interpreted," and this judicial and legislative recognition of the validity of capital punishment by the very men who framed the constitution ought itself to be sufficient answer to the contention of defendant's counsel.

18. Another canon of construction by which to interpret the section in question is comparison with other sections of the constitution relating to the same or kindred subjects. Statutes in *pari materia* should be construed together as mutually explaining and interpreting each

other: Endlich, Interpretation of Statutes, § 35 *et seq.* To this test we will now put the section of the constitution above quoted. In Section 14, Article V of the constitution we find, among the powers delegated to the governor, the following: "He shall have power to grant reprieves," etc. Now a reprieve is a respite from a sentence of death. It is defined by Chitty as follows: "A reprieve operates only in capital cases, and is granted either by the favor of his majesty himself or the judge before whom the prisoner was tried, in his behalf, or from the regular operation of the law, in circumstances which render an immediate execution inconsistent with humanity and justice": 3 Chitty Cr. Law, p. 757. To adopt the theory of the defendant would be to assume that the framers of the constitution abolished capital punishment, and in the same instrument provided that the governor might reprieve any one whom the courts had adjudged to be so punished. The power to lawfully reprieve from the sentence of death pre-supposes the power to sentence to death, and is itself a recognition of the lawfulness of capital punishment.

19. Another canon of construction is that, when a constitutional provision has been taken or copied from the constitution of another state, after it has been construed by the courts of that state, it will be presumed to have been adopted with the construction placed upon it by the courts of the state where it originated: Endlich, Interpretation of Statutes, § 530. Applying this test, we find that the section in question was substantially copied from the constitution of the state of Indiana: Section 18, Article I, Constitution of Indiana. The constitution of Indiana was adopted in 1851, and, being one of the latest before the adoption of our own, naturally served in many particulars as a model. In 1855 the supreme court of that state construed this section: *Driskill* v. *State,* 7 Ind. 338; *Rice* v. *State,* 7 Ind. 332. In *Driskill* v. *State,* 7 Ind. 338, the court says: "In connection with this point

it is insisted that the law authorizing the death penalty is in conflict with Section 18 of the Bill of Rights, which requires the penal code to be founded on principles of reformation, and not of vindictive justice. The punishment of death for murder in the first degree is not in our opinion vindictive, but even-handed justice. There is indeed nothing vindictive in our penal laws. The main object of all punishment is the protection of society. With that end in view the legislature have, in a given case, left it within the discretion of the jury to say when the death penalty shall be inflicted. It is true one branch of that discretion does not contemplate reform; still, it is the only instance in the law in which the purpose of reformation is not prominent, and it cannot, it seems to us, be allowed to give character to the principles upon which the entire code is founded. The eighteenth section of the Bill of Rights, when properly construed, requires the penal laws to be so framed as to protect society, and at the same time, as a system, to inculcate the principle of reform. In this view the present code is no doubt founded on the principles of reformation, within the spirit and intent of the constitution. The law which allows the death penalty to be inflicted must, therefore, be held valid."

The framers of our constitution adopted this section with the robust and salutary construction it had already received in the state of its origin. In addition to this, the very section under consideration has already been construed by this court in an early case, but by reason of this subject not being noticed in the syllabus or in the digests, it has been generally overlooked by the profession. We refer to *State* v. *Anderson,* 10 Or. 448. In this case the court, speaking by Mr. Chief Justice WATSON, says: "It must be regarded as settled in this State that the constitution does not prohibit the legislature from enacting laws for the infliction of capital punishment in proper cases; but, if the question could be

considered open at this time, we should not hesitate to decide that the construction claimed by appellants' counsel for the provision referred to was inadmissible."

We have thus examined every contention of counsel, and can find no reason why a new trial should be granted in this case. We are not unmindful of the terrible consequences of this decision to the defendant, but they are only such as the application of the law to his own conduct has produced.

The judgment of the lower court is affirmed.

AFFIRMED.