Argued April 20, affirmed June 16, rehearing denied September 8, 1914.

# STATE *v.* HOSMER.

### (142 Pac. 814.)

**Criminal Law—Appeal—Discretion of Trial Court—Continuance.**

1. The granting or refusal of a continuance of a criminal case rests in the sound discretion of the trial court, and, unless the decision is manifestly wrong and arbitrary, involving an abuse of sound discretion, it will not be reversed on appeal.

**Criminal Law—Continuance—Discretion of Court.**

2. Where affidavits for a continuance on the ground of absence of witness state the belief of the affiants that the witness can be procured to testify at a subsequent term, but fail to state the facts on which the belief is based, the refusal of a continuance is not an abuse of the trial court's discretion.

**Indictment and Information—Constitutional Requirements—Sufficiency —"Libel."**

3. Under Section 1930, L. O. L., defining "libel" as the willful publication by any means other than words orally spoken of false and scandalous matter with intent to injure or defame another, Section 1439, providing that the manner of stating the act constituting a crime as set forth in the appendix of the Code is sufficient where the forms given are applicable, Section 799, subdivision 2, providing that an unlawful act is presumed to have been done with an unlawful intent, an indictment, following the form set out in L. O. L., Volume 1, page 1013, Form No. 20, except that it is supplemented by the term "unlawful," is not in violation of the right of the accused, guaranteed by Article I, Section 11, of the Constitution to demand the nature and cause of the accusation against him, though it does not allege that the publication was made with intent to injure or defame.

**Libel and Slander—Indictment—Allegation as to Malice—"Libel."**

4. Under Section 1930, L. O. L., defining "libel" as a publication by any means other than words orally spoken of any false and scandalous matter with intent to injure or defame another, and Section 2388, providing that an injurious publication is presumed to have been malicious if no justifiable end or no good motive is shown for making it, an indictment for libel is not faulty, though it contains no allegations that the publication was malicious.

**Libel and Slander—Criminal Liability—Elements of Offense—Repetition of Defamatory Words.**

5. One accused of libel is responsible for the publication of libelous matter as the statement of a third person, though there is no proof that such third person did not make the statements accredited to her.

**Indictment and Information—Duplicity—Offense Against Different Persons.**

6. An indictment, charging a libel against a convent as a corporation and the Mother Superior thereof, is not duplicitous, even though

a part of the publication relates to the convent and a distinct part to the Mother Superior.

### Witnesses—Preliminary Questions.

7. In a prosecution for libel of a convent and its Mother Superior, questions to a witness as to her position and duties, to which she replied that she was the prioress of the convent, commonly known as Mother Superior, and that she had the overseeing of the convent in a general way, being purely preliminary, were admissible.

### Libel and Slander—Criminal Responsibility—"Person" Defamed.

8. Under Section 2403, L. O. L., providing that the word "person" includes corporation as well as a natural person, the publication may be a criminal libel, though it relates only to a corporation, if it has a direct tendency to injure it in its business.

### Libel and Slander—Criminal Responsibility—Words Libelous Per Se.

9. In a prosecution for libel of a convent and its Mother Superior, statements that one was kidnaped and confined as a prisoner in the convent; that she was abused by the priest and Mother Superior from time to time; that the priests from many parts of the valley gathered at the convent and were holding a drunken orgy, and their unmentionable treatment of herself and other nuns who had taken the black veil became unendurable to her; that she knew if they caught her this time they would murder her; that she would rather die than submit herself to their licentious treatment; that they told her that she was to be what the concubines were to Solomon and David and other men of Bible times—were libelous *per se*, though they did not charge the person libeled with a crime, since they exposed those claimed to be libeled to public hatred and contempt.

[As to what words are libelous *per se*, see note in 116 Am. St. Rep. 802.]

### Criminal Law—Evidence—Res Gestae.

10. In a prosecution for libel consisting of the publication of statements of an escaped nun relating to a convent, evidence of statements of the nun, showing that her action in entering the convent was voluntary, was inadmissible as part of the *res gestae.*

From Marion: PERCY R. KELLY, Judge.

The defendant, J. E. Hosmer, was indicted, tried and convicted of libel, and from the sentence imposed appeals. The facts are concisely stated in the opinion of the court. AFFIRMED. REHEARING DENIED.

For appellant there was a brief with oral arguments by *Mr. Robert Down* and *Mr. Walter C. Winslow.*

For the State there was a brief over the names of *Mr. John A. Carson, Mr. Guy C. H. Corliss, Mr. Ernest*

*Ringo,* District Attorney, and *Mr. Andrew M. Craw-ford,* Attorney General, with oral arguments by *Mr. Carson* and *Mr. Corliss.*

Department 2.    MR. JUSTICE McNARY delivered the opinion of the court.

The defendant, editor of a newspaper at Silverton, Oregon, was convicted on the 31st day of October, 1913, of the crime of libel caused by the publication of a pamphlet bearing the title "The Escaped Nun from Mt. Angel Convent, or the Last Stand of Desperate Despotism." The indictment, which was returned by the grand jury of Marion County, on the 20th day of August, 1913, contains the whole of the published article, which is omitted by reason of its prolixity. The article in narrative form recounts the experiences of one Miss Lasenan, whom the authors assert is an escaped nun from the Mt. Angel convent, and is in brief that on a Thursday night in June, 1913, Mary Lasenan, robed in the conventional garb of the convent at Mt. Angel, came to the Christian Church of Silverton and inquired for the pastor, who, responding to her call, was told by the nun that she was seeking refuge from the convent. After secreting herself in the basement of the church until the service hour was over, Miss Lasenan, in the presence of the pastor of the church and four of his parishioners, stated that about six months ago she was kidnaped on the streets of Portland, while walking from her place of work to that of her abode, and taken as a prisoner, and confined in the convent at Mt. Angel, Oregon; that she was forced to do all manner of servile work as a penance for her past sins, and was frequently subjected to abuse by the priests and Mother Superior; that she

had made her escape while the priests were engaged in their evening meal, and if apprehended by them she would be murdered. Continuing, the article recites the commission, by the priests, of many acts of lawlessness which, if true, would invite the avenging hand of justice. Upon arraignment, the defendant entered a plea of not guilty, whereupon the trial of the case was set for October 29, 1913. On October 25th defendant moved the court for an order of continuance until the January, 1914, term of court. This motion was denied, and the denial thereof supplies the first assignment of error. The motion for a continuance is based upon the affidavits of 10 individuals who claim to have some familiarity with the circumstances surrounding the absence of Mary Lasenan. The showing may be epitomized as follows: That for a time prior to October 25, 1913, Mary Lasenan had been living in the household of W. C. Garner of Portland, Oregon; that promptly following the setting of the case for trial, a subpoena was issued for her and forwarded to the sheriff of Multnomah County, who was given instructions as to her whereabouts; that upon investigation the sheriff ascertained the witness was not at her former abode, but had fled therefrom, it being declared for her own safety, on account of an injury sustained by a thrown missile while sojourning at the Garner home, and that, if present, the witness would testify to the truth of the matters contained in the pamphlet.

The crucial point in the showing is whether facts sufficient are set forth from which the court could judge whether there was reasonable grounds to believe the attendance of the absent witness could be procured at any time. To illumine this phase of the case, we must advert to the affidavits filed in support of the

motion for a continuance, touching the matter under consideration.

Mr. Walter C. Winslow, one of the attorneys for defendant, recounts that "defendant, his attorneys and friends have used every effort within their power since the time the said case was set for trial herein to have the said Mary Lasenan where she could be reached and produced as a witness for the defense at said trial; that the inability of the defendant to produce this witness at this time is due, as affiant believes, to the unlawful attacks and assaults which have been made upon her life by persons unknown to affiant or the defendant's attorneys or friends."

Mr. Robert H. Down, one of the attorneys for defendant, in his affidavit says:

"I firmly believe that Mary Lasenan will be present within the jurisdiction of this court, where she will be subject to subpoena before the 1st day of January, 1914; that I base this belief upon the intimations and promises of her friends."

Mr. W. C. Garner, in whose home it is claimed the witness found shelter, says:

"That I am informed and believe that Mary Lasenan will return to Portland, Oregon, before the end of the present year in order to be present at the trial of the said case as a witness for the defendant J. E. Hosmer. * * That I know Mary Lasenan to be a truthful person, and believe that she will return to Portland, Oregon, to give evidence as she promised, but at the present time I have been unable to get into communication with her, and do not know her present whereabouts."

Agnes J. Garner, says:

"That Mary Lasenan is at present with friends at a place unknown to me. She will return to Portland before the holidays. I am unable to give the exact

date of her return, but know same will be in the near future.''

Mr. John A. Carson, of counsel for the state, subscribed to an affidavit in opposition to the motion for a continuance, in which he declared that the injury inflicted upon the person of Mary Lasenan was the product of a conspiracy conceived by the witness and her friends; that following the injury Mary Lasenan was taken to the Good Samaritan Hospital in Portland, where she remained for a considerable time under the assumed name of Mary Smith, until she suddenly left for Vancouver, in the province of British Columbia, from which place she traveled to Seattle, and while there was visited by a son of W. C. Garner, who brought the witness to Portland, Oregon, and now claims to be her lawful husband, and who had informed defendant's representatives that his wife, formerly Mary Lasenan, would not appear as a witness for either party to the criminal action.

1, 2. Without a discordant note, this court has held through a long line of decisions that the granting or refusing of a continuance in a criminal case rests in the sound discretion of the trial court, and, unless the decision is manifestly wrong and arbitrary, involving an abuse of sound discretion, it will not be reversed on appeal: *State* v. *O'Neil,* 13 Or. 183 (9 Pac. 284); *State* v. *Hawkins,* 18 Or. 478 (23 Pac. 475); *State* v. *Fiester,* 32 Or. 260 (50 Pac. 561); *State* v. *Howe,* 27 Or. 146 (44 Pac. 672); *State* v. *Breaw,* 45 Or. 587 (78 Pac. 896); *State* v. *Walton,* 51 Or. 575 (91 Pac. 495); *State* v. *Walton,* 53 Or. 562 (99 Pac. 431, 101 Pac. 389, 102 Pac. 173); *State* v. *Finch,* 54 Or. 482 (103 Pac. 507). Applying this settled doctrine to the situation brought into view by the affidavits, it will appear that there are no facts set out showing a probability of, and giving

assurance of, the attendance of the absent witness at the time which it was proposed to postpone the case, namely, January, 1914, term. The affidavits must state the facts on which the belief of a subsequent attendance is founded, so that the court may say that such belief is a well-founded reasonable expectation, and not a mere hope. It is not sufficient for the affidavits to state merely that affiants are informed of and believe in the existence of a certain ground, but they must go further and state the facts on which their belief is predicated, so that the court may judge as to whether or not their conclusions are reasonable and well founded. In considering the same subject matter, Mr. Justice LORD, in *State* v. *O'Neil,* 13 Or. 183 (9 Pac. 284), said:

"The affidavit states 'that C. M. Miller is a material witness; that he is now in Kansas City, State of Kansas; that his attendance cannot be procured at this term of court, but I am confident I can procure his attendance at the next term of the court.' In this statement there are no facts set out from which the court can judge whether there is reasonable ground to believe that the attendance of the absent witness can be procured at a future day. It is not enough to say, 'I am confident I can procure his attendance at the next term of the court,' but the facts or circumstances upon which such confidence or belief is founded must be set out, so that the court may look into and determine from them whether there is reasonable ground to believe that the attendance of the witness can be procured. 'But if the affidavit,' said CROCKETT, J., 'had stated explicitly his belief that he could procure their personal attendance at the next term, it would still have been insufficient, unless the reasons for his belief had been set forth, to enable the court to decide whether his belief was well founded, or, if he acted on the information of others, he should have stated the nature and particulars of the information. For

the same reason, if a party states, on information and belief, that he can procure the personal attendance of a witness from a distant and foreign country, he should set forth the reasons for his belief and the nature of his information, that the court may decide whether or not there is reasonable ground to believe that the witness will attend. If continuances could be procured on such affidavits as this, the delays in the administration of justice would soon be intolerable.' "

Undeniably great liberality should be extended toward the defendant charged with the commission of a crime in preparing his defense, especially in procuring the attendance of witnesses, yet the rule must not be so loosened as to overthrow the ends of justice. From a careful consideration of the record, we are unable to conclude that the trial court acted arbitrarily or abused the discretion allowed by statute, and the adjudged cases.

3. The next assignment of error turns upon the court's refusal to direct a verdict exculpating defendant upon the ground that the indictment does not state facts sufficient to constitute a crime, in that there is the omission of an allegation that the publication is malicious and published with the "intent to injure or defame." By Section 1930, L. O. L., libel is defined as follows:

"If any person shall willfully, by any means other than words orally spoken, publish or cause to be published of or concerning another any false and scandalous matter, with intent to injure or defame such other person, upon conviction thereof, he shall be punished by imprisonment in the county jail not less than three months nor more than one year, or by a fine not less than $100 nor more than $500."

An inspection of the indictment shows the omission of the phrase "with intent to injure or defame such

other person.'' In the appendix to the Code, under
the caption of ''Forms of Indictment,'' 1 L. O. L., page
1013, Form No. 20, appears to be the one outlined for
an indictment for libel:

''No. 20.

''In an indictment for libel.

''Published or caused to be published in a newspaper
called the ——, the following libel concerning C. D.
(stating the matter published).''

Counsel for defendant argue with much earnestness
that while the legislature may prescribe a form of in-
dictment, it must apprise the accused of the offense
of which he is charged, and that a form which omits
the essential elements of a crime is unconstitutional.
Article I of Section 11 of our paramount law reads:

''In all criminal prosecutions, the accused shall have
the right to public trial by an impartial jury in the
county in which the offense shall have been committed;
to be heard by himself and counsel; to demand the
nature and cause of the accusation against him, and
to have a copy thereof; to meet the witnesses face to
face, and to have compulsory process for obtaining
witnesses in his favor.''

Shortly after the adoption of our Constitution, the
legislature passed the following act which is found at
Section 1439, L. O. L.:

''The manner of stating the act constituting the
crime, as set forth in the appendix of this Code, is
sufficient, in all cases where the forms there given are
applicable, and in other cases forms may be used as
nearly similar as the nature of the case will permit.''

In construing this section of the statute, this court
has held, beginning with the case of *State* v. *Dodson,*
4 Or. 65, until the present time, that an indictment
which contains every allegation mentioned in the form

given in the appendix to the Criminal Code is sufficient: *State* v. *Spencer,* 6 Or. 152; *State* v. *Brown,* 7 Or. 187; *State* v. *Wintzingerode,* 9 Or. 157; *State* v. *Lee Yan Yan,* 10 Or. 366; *State* v. *Dilley,* 15 Or. 73 (13 Pac. 648); *State* v. *Ah Lee,* 18 Or. 540 (23 Pac. 424); *State* v. *Wright,* 19 Or. 258 (24 Pac. 229); *State* v. *Childers,* 32 Or. 122 (49 Pac. 801); *State* v. *Guglielmo,* 46 Or. 250 (79 Pac. 577, 80 Pac. 103, 7 Ann. Cas. 976, 69 L. R. A. 466); *State* v. *Eddy,* 46 Or. 625 (89 Pac. 941, 82 Pac. 707).

Admittedly the fundamental law guarantees to a defendant the right to "determine the nature and cause of the accusation against him," and any form of indictment outlined by the legislature abridging this right would be violative of a sacred right vouchsafed by the Constitution. However, we cannot concede that the section of the Constitution referred to requires the law-making body to adopt a form of indictment embodying every phrase in the definition of a crime, but simply means that the form prescribed shall furnish the accused reasonable information of what he is called upon to answer, by setting forth sufficient of the elements of the offense to give it form and character. An indictment for larceny cannot, under a legislative enactment, be made an indictment for murder without violating the plain meaning of this provision of the Constitution; but, if the indictment following the form prescribed by the legislature sets forth with reasonable certainty the crime for which the accused is to be tried, the mandate of the Constitution is satisfied.

Returning to the indictment, the defendant is charged with having willfully and unlawfully published a certain pamphlet containing false and scandalous matter and libel of and concerning other persons. It will be

noticed that the word "unlawfully" is inserted when not required. Section 799, subdivision 2, L. O. L., in the reading of certain disputable presumptions says "that an unlawful act is presumed to have been done with an unlawful intent." Therefore, bringing this statutory presumption to the aid of the indictment, it must have appeared to the defendant that he was charged with publishing the pamphlet with an "intent to injure or defame." Is the indictment then which follows the form prescribed by statute, save that it is supplemented by the term "unlawful," in violation of the right of the accused to be informed of "the nature and cause" of the accusation against him? We think not. He is charged in the indictment with willfully and unlawfully publishing a certain pamphlet containing false and scandalous matters, which are set forth in detail. This shows the "nature" of the accusation. The persons charged to have been defamed are also stated, which shows the "cause" of the accusation. The purpose inspiring the publication of the article is alleged to have been unlawful. This we think unfolds the intent. Both the nature and cause of the accusation brought against defendant were made known to him sufficiently to enable him to know the particular offense with which he was charged, and to prepare to show his innocence, his excuse or justification. The offense is particularized, so that if he is acquitted, he will be enabled to plead the acquittal in bar of a subsequent indictment for the same offense.

The sufficiency of the indictment cannot be waived, yet we must pause to recount that the accused submitted to a trial without asking, through the medium of a demurrer, that the nature and cause of the accusation be made more explicit.

4. Counsel's position that the indictment is faulty because it contains no allegation that the publication was malicious is untenable, in view of the statutory definition of the crime of libel and the wording of Section 2388, L. O. L., which reads, that:

"An injurious publication is presumed to have been malicious if no justifiable end or good motive is shown for making it."

Defendant offered no testimony whatsoever, and as a consequence the presumption remains that the publication was malicious: *State* v. *Mason,* 26 Or. 276 (38 Pac. 130, 46 Am. St. Rep. 629, 26 L. R. A. 779).

5. The second point raised by defendant's counsel for a directed verdict draws in question the sufficiency of the evidence introduced in behalf of the state; the position of counsel being that the state introduced no evidence conducing to show Mary Lasenan did not make the statements that were accredited to her by the informants of defendant. The argument proceeds upon the theory that the defendant could not be held responsible for a publication of an article, however libelous, if the inspiration thereof was from third parties, unless the defendant had made some intimation of its truthfulness. The essence of the crime of libel is the publication of libelous language, and does not necessarily lie in the authorship of the article. Every repetition of a false and scandalous matter originated by a third person is a willful publication of it, rendering the person so repeating it amenable to the law. If he repeats the libelous words, he must be prepared to prove them, or suffer the legal consequences. An English author thus states the law:

"Every repetition is a fresh defamation, and the defendant by repeating the words has made them his own

and is legally as liable as if he had invented the story himself'': Odgers, Libel and Slander, 172.

And another author in treating of repetitions of scandalous matter originated by others says:

"Talebearers are as bad as talemakers, and it is no defense that the speaker did not originate the scandal, but heard it from another, even though it was a current rumor, and he in good faith believed it to be true. Nor is it any defense that the speaker at the time, named the person from whom he heard the scandal'': Newell, Defamation, p. 350.

It must be true that one who gives currency to a libel is equally guilty with the perpetrator of the libelous charge; otherwise ''scandalous reproaches and foul infamies'' could be uttered with autocratic impunity by placing between the law and the iniquity of the act the presence of a third person. As authority for our conclusions, we cite *Harris* v. *Minvielle,* 48 La. Ann. 908 (19 South. 925) ; 25 Cyc. 574; 18 Am. & Eng. Ency. Law (2 ed.), p. 1056; 3 Wharton's Criminal Law (11 ed.), § 975; *Funk* v. *Beverly,* 112 Ind. 190 (13 N. E. 573).

6. Before the reception of any testimony, counsel for defendant moved the court for an order requiring plaintiff to elect, maintaining that the indictment charged two crimes, one for the libel of Josephine Hess as an individual, and the other of the convent as a corporation. The argument proceeds upon the hypothesis that there were as many offenses charged as there were persons affected by the libelous publication, for the reason part of the article refers to Josephine Hess, the Mother Superior, and a part to the convent. The vice of counsel's position is obvious when the purpose and the intendment of the law is considered. When a libel has been committed, the state

in its sovereign capacity seeks to avenge the wrong, not because of the injury done to the individual, but because the commission of the act tends to affect injuriously the good order of society and the dignity of the state. A single act or transaction in violation of the law may, as a general rule, be charged in one count as a single offense, although the act involves several similar violations of law with respect to several different persons: 22 Cyc. 383. If the gist of the crime of libel was the injury to the reputation of the person libeled, counsel's argument would be unanswerable, and the indictment in mind would be duplicitous, but when we reflect that the perpetration of a libel is punishable because it tends to produce a breach of peace, then it will appear that the number libeled in the article is immaterial, and the libeler is punished for his own act of publishing a libel calculated to produce violence: *Tracy* v. *Commonwealth*, 87 Ky. 578 (9 S. W. 822) ; *State* v. *Hoskins*, 60 Minn. 168 (62 N. W. 270, 27 L. R. A. 412) ; 22 Cyc. 383; *Roberts* v. *State*, 51 Tex. App. 27 (100 S. W. 150). Our conclusion is that the indictment is not duplicitous and that the trial court acted with wisdom in overruling the defendant's motion to elect.

7. Sister Mary Agatha being called as a witness for the state was asked this question:

"What office do you and did you hold during the last summer, including the month of August, in the Benedictine Convent of Mt. Angel, Oregon?"

To which she responded:

"The Prioress of Benedictine Convent, commonly known as Mother Superior."

Objection was made by defendant to the question and its answer, upon the ground that it was incom-

petent, irrelevant and immaterial, and the court's ruling in admitting the testimony is assigned as error. A like objection and exception was taken to the following question and answer:

"Tell the jury what duties devolved upon you as Prioress."

"A. I have the overseeing of the convent in a general way."

We think no wrong was committed by the trial court in admitting the evidence, as in its nature it was purely preliminary and not directly associated with any of the issues made by the indictment, and in no way offered to prove the corporate existence of the Benedictine Convent of Mt. Angel. Most that can be said is that the questions and answers given in response thereto were informal and introductory to matters material to the inquiry.

8. Defendant grieves at the court's action in advising the jury that "to constitute a criminal libel it is not necessary the publication should relate to a person. It can be committed by publishing scandalous matter about a corporation, and which has a direct tendency to injure it in its business." The contention is made that a corporation cannot be libeled. Adverting to the statute, it will be observed that the word "person" alone is used as a designating term of who might be libeled. However, it is not necessary to turn to the adjudicated cases to determine the meaning of the word, as it is defined by statute at Section 2403, L. O. L.: "The word 'person' includes corporations as well as a natural person." Obviously by the strength of the statute a private corporation, as well as an individual, is included in the word "person," and therefore is an object of libel: *State* v. *Herold,* 9 Kan. 194; *State* v. *Boogher,* 3 Mo. App. 442; *State* v. *Will-*

*iams,* 74 Kan. 180 (85 Pac. 938) ; 3 Wharton's Criminal Law (11 ed.), § 923.

9. Complaint is also made to the following instruction given by the court which, in so far as its correctness is questioned, reads:

"I charge you that the following portions of said article are scandalous within the meaning of the criminal statute of this state, and are sufficient on which to base a conviction of the defendant for criminal libel, provided you find that all of the other elements necessary to make out the crime of criminal libel exist, to wit, the following portions of said article: 'I was kidnaped while walking from my place of work to my home on the streets of Portland, and taken as a prisoner, and confined in the convent of Mount Angel, Oregon.' Also, 'I was abused by the priests and Mother Superior from time to time.' Also, 'To-night the priests from many parts of the valley have gathered themselves at Mt. Angel, and are holding a drunken orgy; their unmentionable treatment of myself and other nuns who have taken the black veil became unendurable to me.' Also, 'I know if they catch me this time they will murder me.' Also, 'But I would rather die than submit myself any more to their licentious treatment.' Also, 'But after I took the black veil they told me plainly I was to be what the concubines were to Solomon and David and other men of Bible times. They forced me to do this.'

"Kidnaping is a crime in this state made so by statute. To constitute the crime of kidnaping there must be forcible seizure and confinement or inveiglement of another by a person acting without lawful authority, with intent to cause such other person to be secretly confined and imprisoned in this state against his will.

"I charge you as a matter of law that the extracts hereinbefore pointed out to you from the article published in this case, and which is set forth in the indictment, if it be proven to your satisfaction that the article was published, are scandalous within the meaning of the criminal law, and are sufficient to render

the defendant guilty, so far as that branch of the case is concerned, provided the other elements necessary to constitute criminal libel exist.''

Counsel for defendant proceeds upon the erroneous way that an article to be libelous *per se* must directly charge the person libeled with the commission of the crime. In order to be libelous *per se,* it is not essential that the words should involve an imputation of crime. It is sufficient if the defamatory words be of such a nature that the court can presume as a matter of law they will tend to disgrace and degrade the person libeled, or hold him up to the public hatred, contempt or ridicule, or cause that person to be shunned and avoided. A cursory reading of the excerpts from the pamphlet and contained in the court's instructions, will induce the conviction that the extracts selected from the article either impute a criminal offense, or the commission of acts which, if true, would be scandalous and properly expose those claimed to be libeled to public hatred and contempt: *State* v. *Mason,* 26 Or. 273 (38 Pac. 130, 46 Am. St. Rep. 629, 26 L. R. A. 779) ; *Thomas* v. *Bowen,* 29 Or. 258 (45 Pac. 768) ; 25 Cyc. 250. Without further comment, we must conclude that the learned trial court's instructions were proper.

10. As a concluding appeal for a reversal of the judgment of conviction, counsel for defendant complain of the trial court's action in admitting, over their objection, testimony of the statements made by Mary Lasenan to the sisters of the convent. The testimony giving birth to the controversy is similar in character, and for the purpose of illustration the following excerpts are taken from the testimony of some of the sisters identified with the convent:

Sister Mary Agatha, known as Mother Superior, said:

"She came to us and she said she came on the train, and she came after train time, that is, about half an hour after the train was due, or probably more, and said she missed the station at Mount Angel, and had been carried on to Downs Station, about 1½ or 2 miles I imagine beyond Mt. Angel, and she had walked back from there, carrying her suitcase; she had inquired of some man where the convent was. She told me she was very desirous or most desirous of becoming a Benedictine Sister, and she told me she was a trained nurse and would be very glad to enter our community, and I told her, well, we would be glad to have a trained nurse or were looking for a trained nurse, or would be glad to receive one, and I don't know what else we said there. I cannot remember all the conversation we had, but anyway I told her whenever she got ready she could come to Mt. Angel and we would give her a trial. I asked her if she had any moral obligations in the world that she could not become a member of our community, and she most emphatically said no; I first inquire if they are engaged to be married or have any obligations of that kind, and she repeatedly told me she had nothing to do with any man, and had no engagement or obligation to stay in the world; that she wanted to become a Sister; she told me, though, she would like to get a case at nursing before she would enter. She had a small debt to pay, I understood, to those people with whom she had been staying."

Sister Mary Rose told the jury that:

"I heard her say she wanted to become a Benedictine nun, and that she wanted to go to Mt. Angel."

Sister Mary Adelaide testified that:

"I saw a woman with her suitcase standing at the door as I opened it; she was alone, and I asked her in, and her first words were—the first words she said were that she missed the Mt. Angel station and went to Downs Station and had walked back from there, and she introduced herself as Mary Lasenan; she ex-

pressed her wish to become a nun, and I called Mother Superior.''

Sister Desailes related as follows:

''Well, she came between half-past 5 and 6 o'clock P. M.; and I opened the door and conducted her to the parlor and she told me right away she was at home with the Benedictine Sisters, that she wanted to become a Benedictine Sister ever since—well, from her childhood on, and she asked us when Mother Superior was coming from Mt. Angel, and we told her maybe soon and maybe not for some time, and we asked her whether we could call her up or whether Mother · Superior could call at the family she was staying with, and she said no, she would rather she would not call because the family she was staying with might inform her relatives she was going to Mt. Angel to the convent, and they would get her out; she didn't want anyone to know where she was going.''

The inadmissibility of the testimony is placed upon the ground that it is a species of evidence known to the law as hearsay. Its admissibility is bottomed upon the proposition that the testimony comes within one of the well-known exceptions to the rule against hearsay, being comprehended under the term *res gestae,* things done. Whether we treat the subject as an exception to the rule, or as a rule independent in its nature, is of no consequence so long as the guiding principle is kept in mind. It will be remembered that the indictment, after reciting the defamatory matters claimed to have been stated by Mary Lasenan, alleged that they were false and scandalous. Consequently, it became the duty of the state to establish their falsity beyond a reasonable doubt: *McArthur* v. *State,* 59 Ark. 431 (27 S. W. 628); 25. Cyc. 585. In the article published by defendant, Mary Lasenan is credited with saying that she was kidnaped on one of the streets

of Portland and taken as a prisoner, and held as such in the convent at Mt. Angel where she was subjected to gross mistreatment, the details of which it is profitless to repeat. In view of these assertions published as emanating from Mary Lasenan, it devolved upon the state to show the motives that prompted the novitiate to go to Mt. Angel, and subsequently to leave on account of the treatment she experienced while at the convent. The very life-blood of the charge circulates through the body of the transaction created by Mary Lasenan and the nuns at the convent. These people were the participants, and what was said or done by them under the impulse of the transaction becomes a part thereof, and it is the transaction that thus speaks. Of this matter the Code says:

"Where, also, the declaration, act or omission forms part of a transaction which is itself the fact in dispute, or evidence of that fact, such declaration, act or omission is evidence as part of the transaction."

And as said in *Humphrey* v. *Chilcat Canning Co.,* 20 Or. 213 (25 Pac. 390), this section is declaratory of the common law. It is a legislative definition of *res gestae.*

The declarations of Mary Lasenan concerning her mistreatment being the gist of the offense for which the defendant stands convicted, whatever she may have said of those accused as the authors of her mistreatment are so intimately connected and interwoven with the principal act of the alleged mistreatment as to constitute a part of the *res gestae.* While the scope of the principle here involved is exceedingly vague and indefinite, yet the acts and statements of all the parties to the transaction done and said in the cause that led to the presence of Mary Lasenan in the convent and her subsequent treatment are competent evi-

dence and properly admitted to the consideration of the jury.   As a result of a careful investigation of the records in this case and consideration of the law applicable thereto, we are brought to the conclusion that no errors were committed during the trial of the case and that the judgment of conviction must stand.

                       AFFIRMED.   REHEARING DENIED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE EAKIN concur.